CASE 82.—ACTION BY J. McADOO AND OTHERS AGAINST L. W. GRAHAM AND OTHERS.—Dec. 10, 1909.

## Graham, &c. v. McAdoo, &c.

Appeal from Fulton Circuit Court.

R. J. BUGG, Circuit Judge.

From the judgment defendants appeal.—Affirmed.

1.  Corporations—Operation—Control by Court.—The courts will not interfere with the management of a corporation, because it is not being successfully operated, unless there is actual fraud, or such a wasting of the corporate property as practically amounts to fraud.
2.  Corporations—Mismanagement—Fraud—Sufficiency of Evidence.—Evidence held sufficient to show such mismanagement of a corporation as authorized the appointment of a receiver and the sale of the property.

LEE HESTER and EDW. THOMAS for appellant.

H. H. BARR, T. N. SMITH and W. J. WEBB for appellees.

OPINION OF THE COURT BY JUDGE BARKER—Affirming.

The Fulton Electric Light & Power Company was organized in the year 1899, under the general corporation laws of the state of Kentucky, with an authorized capital stock of $30,000, divided into shares of the par value of $100 each, and was authorized under

the terms of its charter to manufacture and sell electric light, heat, and power, and to deal in coal and ice. It is located in the city of Fulton, Ky., where it has since its organization been engaged in the business which it was chartered to do. It is a valuable property, and constitutes the subject-matter of this litigation. In 1906 L. W. Graham was elected the president and general manager, his brother-in-law, William Robinson, was elected vice president, and his sister-in-law, E. C. Robinson, the wife of William Robinson, was appointed secretary. The board of directors consisted of L. W. Graham, L. C. Graham, his wife, William Robinson, his brother-in-law, J. H. McClure, and C. E. Rice. As soon as L. W. Graham was elected president, there developed a powerful opposition to him from all of the stockholders outside of his family; and it may be said that from that time until the appointment of a receiver by the circuit court the history of the corporation has been exceedingly violent and stormy. Without going into this phase of the case with minuteness, it may be said that the two factions among the stockholders have been at daggers' points all of the time, and frequently a general and free fight was imminent, although, happily, this extremity was not actually reached. That faction of the stockholders which constitutes the appellees here own in the aggregate 150 shares of the capital stock of the corporation, while L. W. Graham, his wife, his brother-in-law, and sister-in-law together own 150 shares; it thus appearing that the shares of the capital stock are equally divided between the warring factions. After L. W. Graham had operated the plant for a year, this action was instituted by the appellees for the purpose of having a receiver appointed to take charge of the property, and for a dissolu-

tion of the corporation and a sale of the plant as a whole. The basis of this claim on the part of the appellees was alleged to be the fraudulent acts of Graham in the management of the corporation, his wrongful appropriation of its money to his own use, his reckless wastefulness and unbusinesslike methods in the management of the plant, and his fraudulent refusal to allow the appellees to participate in or have any influence in the management of the corporation, or even to examine its books or know what was being done with their property interests. Graham and his associates denied all these allegations, and the issues between the parties were made up along these lines. Pending the litigation the circuit judge appointed R. N. Chowning receiver, who took charge of the corporate property and operated the plant under the orders and direction of the court. After the introduction of a great deal of evidence on both sides, the case was submitted for final judgment, and the circuit judge rendered a judgment continuing the receiver and ordering a sale of the property as a whole. From this judgment, this appeal has been prosecuted.

The condition of affairs between the two factions, who are appellants and appellees here, is an anomalous one. Each owns an equal number of shares of the capital stock, and yet, by reason of the fact that L. W. Graham is president and authorized to cast the deciding vote where there is a tie, he is enabled to entirely monopolize the management of the corporation and to exclude the appellees from any participation therein. Prior to his election as president, the board of directors consisted of seven stockholders; but after his election he proceeded to have the number reduced to five, and this enabled him, out of the bosom of his own family, to put in a sufficient num-

ber of directors to entirely control the management of the corporation. This could not have been done if the number had remained at seven, as before his election. But by reducing the number to five, and electing himself and his wife and brother-in-law into the board, he secured absolute control of the corporation, by having a majority of the directors in his interest. In his testimony he explains this change in the number of directors by saying that prior to his election the appellees, who then had control of the corporation, had fixed the number of directors at seven, in violation of the charter, and that he had the number reduced in order to comply with the charter. In this statement he is inaccurate, as a reference to the charter will show. That instrument provides on this subject that the number of directors shall not be less than five; but there is nothing in it which prohibits the number from being greater than five. This manifest error as to the facts concerning the reduction of the number of directors accentuates the charge that it was made to enable Graham to more readily control the affairs of the corporation by directors selected from the bosom of his own family. The evidence shows that as soon as he was elected president he had his salary increased, as were also the salaries of the minor officers. It also shows that L. W. Graham conducted the affairs of the corporation in an exceedingly slovenly and unbusinesslike manner, if it does not authorize the conclusion that his actions and conduct amounted to fraud. It appears, also, that under the prior management the corporation had been prosperous and earned dividends, which were paid to the stockholders; but since his election and during his management it has not made money, but has be-

come indebted to the extent of several thousand dollars.

One of the items relied upon by the appellees to establish the fraud of L. W. Graham was that his books showed that he gave two checks for payment of two car loads of coal from the Crabtree Coal Company, although it appeared that he only purchased one car load from that company, and he was able to make no satisfactory statement with regard to who got the money represented by the second check.   This was a comparatively small matter, and, standing by itself, might be allowed to go unchallenged; but when we find, as appears from the testimony of Miss Tate, the bookkeeper of his own selection, that he constantly collected bills due the corporation and appropriated the money to his own use, and would make settlements not oftener than once or twice a month, and then she simply took his word for the amount he owed the corporation, and entered the items in accordance with his dictation, we are forced to conclude that his conduct was recklessly unbusinesslike, if not fraudulent.   It also appears that three or four pages of the daybook were torn out, thus making it impossible for anyone to know what items were concealed by the destruction of the leaves upon which they had been entered.

The appellees further point out, and this was admitted by Miss Tate, that at Graham's dictation she had entered an item of $473 on the labor account, and some time afterward, by his direction, she erased this item and entered an item of $5 in its place.   This Graham explained by saying that the $473 was in large part for lawyer's fees he had to pay for litigation which had been imposed upon him by appellees, and he thought at first this should be charged to the

corporation, and he had therefore charged it to the labor account, but afterwards concluded that he ought to consult the board of directors about the item, and he therefore required the bookkeeper to erase the first entry and replace it with the small item before mentioned. As to this, we are forced now to take his word, as there is no other explanation of it in the record. It also appears that several pages of the impression or letter book were torn out, and no rational explanation was given of this.

Appellees point out that L. W. Graham and his wife originally owned 75 shares each of the corporate stock, and they charge that, in order to make his brother-in-law and sister-in-law eligible as officers of the corporation, he and his wife transferred to them each 5 shares of the stock, and for the purchase money took the notes of the vendees, with the stock as collateral security; and there is testimony in the record tending to sustain the charge that this was done so as to make it possible that the family could control the affairs of the corporation. Now, under this situation of affairs, what is the duty of the court with reference to the final disposition of the corporate property? It is conceded at the outset that the courts are without jurisdiction to take from a majority of the stockholders the management of a corporation simply because they are not successfully operating it; that is, that they are not operating it so as to make money. The general rule is, as stated by counsel for appellants, that the courts will not interfere with the management of a majority, unless there is actual fraud, or such a wasting of the corporate property as practically amounts to fraud. Therefore it is not necessary to review any of the authorities cited by counsel for appellants on this subject. The case discussed in

the brief is not the question we have here.  This is not a management of the corporate property by a majority of the stockholders.  On the contrary, the appellees own precisely as much stock as do appellants, and yet they have not been permitted to have any voice or influence in the management of the corporation, or the fixing of the salaries of officers, or in deciding who the officers should be.  There seems to us to be substantial grounds for the charge that L. W. Graham so cunningly arranged matters as to enable him, although he and his faction owned but half of the stock, to obtain the absolute control and management of the corporate property, very much to its detriment and to the injury of the appellees.  If he had allowed the number of directors to remain at seven, then he would, perhaps, have been forced by circumstances to select a majority of these officers from stockholders other than his own family; but, having reduced the number to five, as said before, he could, out of the bosom of his own family, readily select a majority of the directors, and thus absolutely control the whole situation by voting for himself and for his own measures.

We think this record shows that the corporation, prior to the time Graham obtained control, had been managed with economy and success, and that since he has had control it has been managed in a very unbusinesslike and wasteful manner, and that a continuation of his management will inevitably result disastrously to the corporate property; that it is to the interest of all the stockholders that the corporation should be dissolved and the property sold, in order that it may be purchased by one faction or the other, and thus restore a harmony in the management which it is evident never can be obtained while the situation

remains as it now is.   To leave these warring stock-holders as they were prior to the time of the appoint-ment of the receiver by the circuit court would be but to insure the wrecking of the property.   We are of opinion that there was sufficient evidence of mis-management, if not actual fraud, to authorize the in-terposition of the chancellor in the appointment of a receiver, and for his judgment in ordering the prop-erty sold.   When the case returns to the circuit court, the chancellor will doubtless order the sale on such terms as to time as will enable either party to pur-chase it if they desire, and this will insure such an active competition between the factions, and perhaps others, for the property, as will insure that there will be no sacrifice of it at the sale.

We are strengthened in the opinion we have reached by the fact that we are concurring in the con-clusion of facts arrived at by the learned circuit judge.   He was on the ground.   He, perhaps, knew all the parties, their position in society, their credi-bility as witnesses, and his opinion should not be lightly set aside, but, on the contrary, should be up-held and maintained, unless the appellate court is firm-ly of the opinion that his conclusion is contrary to the weight of the evidence, which is not true in the case before us, as we have expressed above.

In conclusion, believing, as we do, that it is for the substantial interest of all parties concerned that the judgment of the circuit court should be affirmed, it is so ordered.