## Metropolitan Fire Insurance Company v. Middendorf, et al.

### (Decided October 27, 1916.)

### Appeal from Kenton Circuit Court.

1. Corporations—Receiver for Insurance Corporation—Appointments. —An insurance corporation which is only in the preliminary stages of its organization and has never been granted a license to do an insurance business in this state is not under the exclusive dominion of the insurance department, and a receiver for such corporation may be appointed at the instance of stockholders without any application to the insurance department.

2. Corporations—Insolvency—Appointment of Receiver.—The appointment of a receiver is very largely in the discretion of a chancellor, but his power to appoint will be always cautiously exercised; where, however, the evidence discloses a reckless and fraudulent manipulation of two corporations for the personal benefit of one man, and it is apparent that the corporation can never accomplish the purpose for which it was organized, it is the duty of the chancellor to take hold of and administer the assets for the benefit of the creditors or stockholders.

3. Corporations—Receiver—Minority Stockholders.—Where it appears that the affairs of a corporation are being fraudulently mismanaged and its assets in imminent danger of being lost to the stockholders through the collusion and fraud of officers or agents, equity will not hesitate to assume charge and control of the property through a receiver appointed at the instance of minority stockholders.

H. O. WILLIAMS, WILLIAM A. BYRNE and JAMES H. POLSGROVE for appellant.

S. D. ROUSE, JOHN T. MURPHY and MYERS & HOWARD for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

In April, 1914, the Metropolitan Fire Insurance Company filed its articles of incorporation with the Secretary of State, its purpose being, as indicated by its title, to engage in the fire insurance business. In the articles of incorporation its capital stock was fixed at 25,000 shares of the par value of $10.00 each. Its officers and agents thereafter, presumably proceeding along legitimate lines, offered its capital stock for sale to the public, but met with very indifferent success.

But on the 9th day of October, 1914, it entered into a contract with Charles E. Dexter by which it employed

him as its sole agent to sell its entire issue of stock; under the contract Dexter was to employ canvassers and agents at his own expense who were to sell the stock at $20.00 per share, unless otherwise agreed upon in writing, payable in cash or one-half cash and the other half in notes of the purchaser, or on such other terms as might be approved in writing by the President of the Fire Insurance Company, and Dexter was to receive in cash for making said sales thirty per cent. of the selling price of the stock.

Shortly after this contract was made between the fire insurance company and Dexter there was incorporated the defendant The Metropolitan Trust Company, for the ostensible purpose of underwriting the business of the Metropolitan Fire Insurance Company, but really for the purpose of having assigned to it the contract between Dexter and the fire insurance company so that the sales of stock might be made in the name of and through the instrumentality of the trust company. The trust company has a capital stock of $20,000, one-half of which is represented by the contract which was assigned to it by Dexter with the fire insurance company and only a small part of the remaining capital stock was actually subscribed and paid for so far as shown by this record. The fire insurance company had a suite of offices in Louisville and the trust company occupied the same offices.

After the organization of the trust company an active campaign was begun for the sale of the fire insurance company's stock, and up to January, 1916, about 35,000 shares of the fire insurance company's stock had been sold or contracted for—ten thousand shares more than it was authorized to issue—most of which had been sold at $20.00 a share and a small part at $25.00 a share. The plan usually adopted to sell the stock was to require the payment of half of the purchase price in cash and to take the stockholder's note for the other half, it being represented to the purchasers that the cash paid for the stock was to be set aside as a surplus fund as security to the policyholders and the notes were to represent the working capital and would never have to be paid as the dividends on the stock would pay them in full.

This is an equitable action by appellees Fred and Henry Middendorf suing for themselves and other stockholders similarly situated, seeking the appointment

of a receiver to take charge of the assets and affairs of the fire insurance company and to require the trust company and Dexter to account to the fire insurance company for any money retained or held by them, or either of them belonging to the fire insurance company, and requiring them to pay said company the commissions retained by them in excess of a reasonable amount, and praying that their notes be cancelled, and that the defendants be enjoined from transferring or assigning the same, and that the affairs of the fire insurance company be wound up and its assets distributed.

A full hearing was had on application for the receiver and evidence taken, and thereafter the plaintiffs filed an amended petition wherein it is alleged that the trust company had been incorporated ostensibly for the purpose of underwriting the business of the fire insurance company, but in fact as a part of a scheme conceived and devised by Dexter to swindle and defraud stockholders who had been persuaded, or who might be persuaded, to buy the stock of the fire insurance company, that the trust company had in its possession assets and property belonging to the fire insurance company, and books, papers and other documents showing the condition of the affairs of the fire insurance company, and that the trust company was largely indebted to the fire insurance company, and that if the fire insurance company had any assets, because of such fraud and scheme they were in danger of being wasted, lost or dissipated, and prayed for the appointment of a receiver for the Metropolitan Trust Company.

Upon the filing of this amendment, the court having already heard the evidence presented on the motion to appoint a receiver for the fire insurance company, immediately and on the same day of the filing of the amendment, without the issual of any process thereon against the trust company, proceeded to, and did, appoint a receiver for the trust company.

This is an appeal by the fire insurance company and by the trust company from these two orders appointing receivers for them respectively.

The original petition alleges that the plaintiffs on about the 21st of October, 1915, upon certain representations made to them by the agents of the fire insurance company, subscribed for twelve and one-half shares of the capital stock of said fire insurance company and that they each paid $125.00 in cash and each executed a note

for $125.00 in payment therefor; that the agents represented to them that as much as four hundred thousand shares had already been sold of the capital stock of the company and the funds therefor collected, and that the company had on hand sufficient funds to entitle it to a license to do an insurance business in the state of Kentucky, and that it was about to and would on or about January 1st, 1916, procure said license and begin business; that of the $20.00 per share, the purchase price of the said stock, it was represented to them that $10.00 thereof would be set apart for a surplus fund to be held by the company as security to those insuring their property therein and $10.00 was to be working capital, and that the notes would not have to be paid by them because the dividends accruing upon their stock would pay off the same in full; that these representations were each and all false at the time made and known by the company's agents to be false and were not known by the plaintiffs to be false, but were believed to be true by the plaintiffs and relied upon by them, and that they would not have bought the stock except for such belief and reliance; that the defendant Dexter at the time was the active and controlling agent of the fire insurance company in and about the sale of its stock, and as such agent had made some sort of arrangement or agreement with the Metropolitan Trust Company, of which Dexter was and is the President and active manager, under and by the terms of which the fire insurance company was to pay the trust company thirty per cent. of the gross amount for each share of stock of said insurance company sold as commissions for such sales; that of the cash which has been collected for the sale of stock either Dexter or the Metropolitan Trust Company had been paid thirty per cent., leaving but twenty per cent. of the cash collected as the assets of the fire insurance company, as under the plan adopted the cash paid in only represented fifty per cent. of the selling price of the stock. It further charged at that time the fire insurance company had not sold nor had it collected sufficient funds from stock sales to entitle it to a license to do business in the state of Kentucky, and that said company could not therefore qualify under the laws of this state to do business on the first of January, 1916, or thereafter; that they did not know at the time they entered into the contract for the purchase of the stock that Dexter or the trust company was receiving thirty per

cent. of the gross price of the stock sold (all of which was taken out of the cash payments), as commission for the sale thereof, and they therefore charge that the contract between the fire insurance company and Dexter and the trust company was unfair, unjust, and unconscionable and a fraud upon the plaintiffs and each of the stockholders of said company.

In an amended petition it was alleged that the fire insurance company had an authorized capital stock of $250,000 which it and the other defendants were endeavoring to sell at $20.00 per share when $10.00 is the par value of each share, and the remaining ten dollars it was represented would be placed in and secretly held as a surplus fund, the purpose of said fund being falsely explained as necessary to enable said company to engage in business in other states, but that the real purpose was to enable the defendant Dexter and the Metropolitan Trust Company to help themselves to the cash paid in for such stock; that Dexter was the managing officer of the fire insurance company in the sale of its stock and by the contract had been placed in absolute charge of its affairs in that respect; that the contract between Dexter and the fire insurance company and the trust company, under the plan for the sale of stock adopted, operated so as to permit the deduction of the entire thirty per cent. commission from the fifty per cent. cash paid in, and that Dexter and the trust company ought to be required to account to the fire insurance company for the excess of such commissions over and above the commission paid on the cash actually collected for such subscription, and to be required to accept a reasonable compensation for such services.

On the hearing it was developed that the articles of incorporation of the fire insurance company were filed in April, 1914, and that under them the company was authorized to issue 25,000 shares of stock at the par value of $10.00 each; that in the face of this provision, on the first of January, 1916, there had been sold 35,000 shares of stock in this company at the price of $20.00 per share and some small part of it, even at $25.00 per share; that these shares were sold for $10.00 per share in cash and the notes of the purchasers taken for the remainder of the purchase price; that under the contract made by Dexter with the fire insurance company, and subsequently assigned by him to the trust company, he had the right to take thirty per cent. of the gross

purchase price as his commission, and when stock was sold at $20.00 per share, one-half cash and the other half represented by what is known in the record as a "blue note," he would take his thirty per cent. of the whole purchase price of $20.000 out of the cash payment—that is to say, he took sixty per cent. of the cash payment of $10.00 as his commission and paid to the company only forty per cent. of same.

The evidence also shows that false representations were made by the agents of the company to the purchasers as to the capital stock of the company, and as to their liability on the blue notes which they were required to execute; likewise false representations were made to certain persons as to the sale to them of special stock in the company from which they were presumed to receive some special benefit; that there is now no cash in the treasury of the fire insurance company, notwithstanding these enormous sales of stock and payments in cash; that it only had certificates of deposits for some five or six thousand dollars; that the agents were authorized to exchange stock in the company for other securities, and sometimes did so.

The secretary of the fire insurance company testified and filed a list of the stocks and bonds which he said the company held, which at their par value aggregate about $103,000, but he does not undertake to say that these stocks and bonds are of that value, or what their value is, or whether in fact the stocks, bonds or certificates of deposits have been hypothecated or pledged.

Even under the unconscionable scheme of taking the whole commission out of the cash payments for stock, from the $350,000 collected in cash the company ought to have at least $140,000, or forty per cent., which Dexter and the trust company generously allowed it; but even under the showing of the secretary, taking all his statements as true and assuming that the stocks and bonds and certificates of deposit are all of par value, and none of them pledged or hypothecated, the fire insurance company has been mulcted, in some way or other, out of from thirty-two to thirty-five thousand dollars.

The evidence further showed that the officers of the fire insurance company paid little or no attention to its business; that they were engaged in other business and went to the office for a short time only, each day.

It is apparent from all the evidence that this fire insurance company, which had never been granted a license to do business in this state, and which could lawfully only do business to the extent of selling its stock, virtually turned over its whole business to Dexter when, by its contract, it made him its sole agent for the sale of stock; in other words the only business which it had a right to do under the law was turned over to Dexter, and as he was the organizer of and the president of and in control of the trust company, he in truth and in fact had absolute control and dominion over the affairs of both companies, and that he managed the affairs of the fire insurance company for the benefit of the trust company and managed the affairs of the trust company for his own benefit is perfectly clear from the evidence.

The fire insurance company filed a special and general demurrer, both of which were overruled.

It is urged that the special demurrer should have been sustained because the court had no jurisdiction; that under the insurance laws of this state the jurisdiction to wind up an insurance company is solely in the insurance department.

In consideration of this question it must be borne in mind that the Metropolitan Fire Insurance Company has never been authorized to do an insurance business in this state, that it has never passed the preliminary stage of its organization. It is provided by section 752 of the Kentucky Statutes that the Insurance Commissioner, upon the request of five or more of the stockholders, creditors, policyholders or persons pecuniarily interested, shall make an examination of any insurance company, etc. From the very language of this statute it is apparent that the companies referred to are such as are actually doing an insurance business; the company in question could have had no policyholders because it had never been authorized to issue a policy, and it is perfectly clear that even if the Legislature meant to give the Insurance Department exclusive control over all insurance companies, and to provide exclusive remedies by which they might be controlled, and placed those remedies exclusively in the hands of the Insurance Department (which this Court has not held), still it could have no application to an insurance company which was only in the preliminary stages of its organization and which had never been granted license to do an insur-

ance business. We entertain no doubt that the action of the lower court on the special demurrer was proper.

It is also urged that the general demurrer should have been sustained because it did not state facts authorizing a Chancellor upon the application of a stockholder to appoint a receiver or to grant any other relief sought.

The petition not only alleges that it was falsely represented to the plaintiffs that it had collected sufficient funds to entitle it to a license to do an insurance business in Kentucky, but further alleged that it was represented to them that the $10.00 per share payment in cash was to be set aside as a surplus fund of the insurance company, when in truth and in fact sixty per cent. of that sum was, through the scheming and manipulation of Dexter, diverted into the trust company or Dexter's hands. The effect of the allegations in the petition are that Dexter, through his contract with the fire insurance company, had secured control and dominion over both of the corporations and was using them for his personal benefit, and, as we have seen, the evidence abundantly sustains these allegations.

The appointment of a receiver is very largely in the discretion of a Chancellor, and we fully recognize the wisdom of the rule that it is a power to be cautiously exercised at the instance of minority stockholders, for majority stockholders have the right ordinarily to control the affairs of a corporation, and the Chancellor will proceed with great care and be sure of his ground before taking that control from them. But under the facts of this case there can be no doubt that the Chancellor wisely exercised his discretion; the evidence discloses a reckless and fraudulent manipulation of these two corporations for the personal benefit of one man. In fact it shows a state of case which seriously raises the question in one's mind whether from the time Dexter entered into the stock-selling contract with the fire insurance company there was ever in good faith any purpose to organize an insurance company; for the evidence shows that eight or nine months before this suit was brought the necessary funds were on hand to have justified the Insurance Commissioner in issuing a license to the fire insurance company if it had been applied for and no other objections appeared. The record strongly suggests a purpose to sell as much of this stock by Dexter as could be disposed of so that the com-

missions thereon might be received, without any intention of actually completing its organization as an insurance company. Under such conditions it would be a reflection upon our whole system of jurisprudence to say that a Chancellor should not take hold of the assets of the concern and administer them for the benefit of these deceived and hoodwinked stockholders who had been induced to pay these astounding prices for stock in an insurance corporation which had never been granted and which had not even applied for a license to do an insurance business.

What we conceive to be the correct rule to be followed in the appointment of receivers for corporations at the instance of minority stockholders is clearly and well stated in Gluck & Becker's 2nd Edition of their work on Receivers for Corporations at page 54:

"Corporate property is essentially a trust fund to be used for the benefit of creditors and shareholders. The officers of a corporation, in the management of its property, stand in a fiduciary relation. It therefore follows that if trust funds or properties are being mismanaged and in imminent danger of being lost to the stockholders and creditors through the collusion and fraud of such officers, modern equity will not hesitate to assume charge and control of the property through a receiver. The power of a court of equity in this respect will be exercised with great caution and only when the exigencies of a case clearly warrant it, and the proper relief cannot be had by injunction or some other preventive remedy. Following this doctrine, the Supreme Court of Michigan, in a recent case, held that a court of equity, in the exercise of its general equity jurisdiction, has the power, at the instance of one or more of the stockholders of a corporation which has utterly failed of its purpose, not because of matters beyond its control, but because of fraudulent mismanagement and misappropriation of its funds, to dissolve the corporation and appoint a receiver of its property. This adjudication is easily defended under the general rule of equity jurisprudence that it is the duty of a court of equity to adapt its practice and course of proceeding to the existing state of society. In this age of corporations the rights and interests of minority stockholders require the existence of such powers in the court to protect them against the frauds of the majority or the unfaithful officers who seek to carry out their designs or to serve

their own purposes in antagonism to the best interests of the corporate body.''

The Michigan case of Minor v. Bell Isle Ice Company, 93, Michigan, 97, referred to in the text above quoted, made this statement of the rule, which seems to be approved by the text writer, to-wit:

''The general rule undoubtedly is that courts of equity have no power to wind up a corporation, in the absence of statutory authority. This rule is, however, subject to qualifications. It has been held 'that when it turns out that the purposes for which a corporation was formed cannot be attained, it is the duty of the company to wind up its affairs; that the ultimate object of every trading corporation is the pecuniary gain of its stockholders; that it is for this purpose, and no other, that the capital has been advanced; and if circumstances have rendered it impossible to continue to carry out the purpose for which it was formed with profit to its stockholders, it is the duty of its managing agents to wind up its affairs. To continue the business of the company under such circumstances would involve both an unauthorized exercise of the corporate franchise and a breach of the charter contract. Morawetz Corporations, 217, 407.''

It is apparent from the evidence in this record that this insurance company could never have accomplished the purpose for which it was incorporated; it is inconceivable that any insurance commissioner in possession of the facts disclosed by this record would ever grant to it a license to do an insurance business in this state, and it would seem to be a perfectly sound rule that whenever it is clearly demonstrated that a corporation cannot accomplish the purpose for which it was organized it is the duty of the Chancellor to take hold of it and administer its assets either for the benefit of its creditors or its stockholders as the case may be.

There is also an appeal by the Metropolitan Trust Company from the order of the circuit court appointing a receiver for it, and for the reasons given in an opinion, this day delivered, upon the application of the trust company to this court for a writ of prohibition against F. M. Tracy, Judge, that judgment is reversed; but upon the return of the case the trust company will be before the court for all purposes in as much as it has appealed from that judgment.

We have not passed upon the validity of the contract between Dexter and the Fire Insurance Company or upon whether the "blue notes" should be cancelled, as they are questions for the Chancellor upon a final hearing.

The judgment is affirmed as to the Metropolitan Fire Insurance Company, and reversed as to the Metropolitan Trust Company, with directions to set aside the order appointing a receiver of the latter company.