## Oscar C. Wright Co. et al. v. Steenman.

(Decided. May 22, 1934.)

TRABUE, DOOLAN, HELM & HELM and LUKINS & JONES for appellants.

WOODWARD, HAMILTON & HOBSON and OLDHAM CLARKE for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This appeal requires the review of an order appointing a receiver of "all and singular property, rights, contracts, money, credits, choses in action and effects, including all stock books, certificates of interest, bonds, securities, furniture, fixtures, books of accounts and all records" of the kentucky Electric Development Company, Public Utilities Development Company, Incorporated, Oscar C. Wright Company, Utilities Investment Corporation, Utilities Extension Corporation, and Utilities Engineering Corporation. The order appointing the receiver at length and in detail lists the authority, the privileges, rights, and duties of the receiver.

The action was brought by L. D. Steenman, a former officer of one or more of the corporations. Intervening petitions were filed in behalf of four other persons who claimed to be stockholders of the Oscar C. Wright Company, Public Utilities Development Company, Utilities Development Company of Indiana, and Kentucky Electric Development Company.

Eight corporations were organized and closely affiliated and practically directed by one individual, Oscar C. Wright. The parent corporation of the structure was the Kentucky Electric Development Company and, at the time of the filing of this action, engaged in the business of supplying electric power to rural communities in Kentucky. From its own power plants together with the electricity purchased of the Kentucky Utilities Company, it supplied its customers. It manufactured and sold ice in only one locality. Its tangible assets now consist of this ice plant, its electric power plants, and distributing power lines; its intangible consist of franchises and its right to call on its affiliated corporations for those extensions into new territory prospects for new or additional business. At the institution of this action it had outstanding 1,500 shares of no par, common, and 3,256 shares of 6 per cent. par preferred, stock. Until shortly before the institution of the action, the general public owned $325,600 worth of the preferred

stock. Recently, the Public Utilities Development Company has acquired 1,402 shares of the preferred stock, leaving the public owning 1,854 of the preferred, and 98 shares of the common stock; the balance of the common is held by the Public Utilities Development Company. The preferred has no right to vote unless, and until, two successive divdends have been passed. The affairs and destiny of the Kentucky Electric Development Company are in the hands of the Public Utilities Development Company through its practically sole ownership of the voting power of the common stock. The latter has no tangible property. Its assets consist entirely of the 1,402 shares of the Kentucky Electric Development Company common, and a few hundred shares of its preferred and the stock owned by it in the other affiliated corporations. The public owns 2,735 shares of the common of the Public Utilities Development Company and 63,201 are owned by the Oscar C. Wright Company. In this manner the Public Utilities Development Company controls the Kentucky Electric Development Company and in turn is not only entirely owned by the Oscar C. Wright Company, but practically controlled by it. The Oscar C. Wright Company has issued Class A, and common, stock, and no preferred. Class A, except under certain conditions, has no voting power; hence the holders of the common stock of the Oscar C. Wright Company by voting their stock have the management of both the Kentucky Electric Development Company and the Public Utilities Development Company.

There are outstanding of that stock 12,259 shares, of which 12,038 are held by the public. There are outstanding 6,024 shares of Class A, the public owning 3,924 shares; the remainder is held by the Utilities Investment Corporation, an affiliated corporation. In this manner the Oscar C. Wright Company is the holding company for the Public Utilities Development Company, which exercises the control of the operation of the Kentucky Electric Development Company.

It is substantially shown that the only income with which to pay dividends on these different stocks are the earnings of the Kentucky Electric Development Company. Its gross earnings in 1931 were around $60,000. The income on all of these stocks is derived from the Kentucky Electric Development Company. Its net earnings for 1932 was about $26,000, out of which $3,700 was expended in the payment of interest on the $75,000

worth of bonds secured by a lien on its plant at Munfordsville, Ky., and guaranteed by the Kentucky Electric Development, leaving about $22,000 for distribution to its stockholders in 1932, not considering its unpaid liabilities. $19,536 is required to pay the dividends on 3,256 shares of the Kentucky Electric Development Company preferred, leaving about $2,700 for the Public Utilities Development Company to pay the dividends on 1,402 shares of the former owned by the latter. It is indeed apparent the $2,700 so received by the Public Utilities Development Company would not pay the dividends on the 2,846 shares of its stock owned by the public. It is substantially shown, as matters now stand, if all past-due, direct and contingent liabilities of the Kentucky Electric Development Company were paid, the holders of the Public Utilities Development Company common and Oscar C. Wright Company common and Class A stock could receive nothing.

It is shown the operations of the Kentucky Electric Development Company until 1931 were accompanied by intensive, successive drives to sell to the public, the Oscar C. Wright Company and the Kentucky Electric Development Company. The campaign was energetically carried on by the Utilities Investment Corporation, which is owned exclusively by the Oscar C. Wright Company. The commissions received by the former and indirectly by the Oscar C. Wright Company, in the form of dividends, were its only source of income. The Kentucky Electric Development Company was controlled, managed, and supervised by the Oscar C. Wright Company, the latter charging a fee for its services; in the year 1930, the value of these services was $20,400.

The Indiana Development Company, a corporation organized under the laws of the state of Indiana, was originally owned by the Kentucky Electric Development Company. The purpose of organizing the Indiana corporation was to extend into Indiana the activities of this group of corporations. The accomplishments of the Indiana corporation have been to sell about $22,000 worth of its stock and lend the money so obtained to the Oscar C. Wright Company. Its only assets consist of notes evidencing its loan to the Oscar C. Wright Company and a small lot of uncollected subscriptions. The Utilities Appliance Company is owned by the Kentucky Electric Development Company. The purpose of the organization of the Utilities Appliance Company was to

engage in the business of retailing electrical appliances and installing electrical fixtures, either wholesale or retail. Proceedings are pending to have the Utilities Appliance Company declared a bankrupt.

The only income this group of corporations can receive, or expect, is the net earnings of the Kentucky Electric Development Company, which will be exhausted by the prior claims of the Kentucky Electric Development Company and the Public Utilities Development Company preferred stock. The Class A of the Oscar C. Wright Company and the common of the Public Utilities Development Company are valueless and will continue so to be until this group of corporations can resume electrifying new communities with the proceeds of stock sales and turning them over to the Kentucky Electric Development Company for profitable operation.

Steenman in his testimony fixed the liability of certain ones of this group of corporations to him at $80,000. It is conceded by Oscar C. Wright, in his testimony, that the debts of Steenman aggregated $30,000. The number of shares owned by Steenman are not disputed, except his ownership is criticized because a transfer thereof has not been completed on the stock book of the corporation. The sum total of cash on hand belonging to the group is $1,200 in banks. The Kentucky Electric Development Company's debts, not including its indebtedness to Steenman, is $27,965.56 unsecured, and the $75,000 evdienced by its bonds. The Oscar C. Wright Company is indebted on open accounts $5,156.99, on notes $12,102.30. Excepting the stock owned by the Oscar C. Wright Company in the affiliated corporations, it owns nothing with which to pay these debts; the Kentucky Electric Development Company has only its net earnings for like purpose. Owing to its financial condition, it has been compelled to allow certain insurance policies to lapse, leaving its hazardous operations without insurance to protect its employees or the public who may be injured thereby.

The set-up of this group of corporations was based upon a small investment of cash and an exaggerated visualization of interlocking, elaborate, and enduring corporate edifices, rivaling other extensively financed, corpulent corporations, engaged in like business throughout the United States. The originators and promoters of the group impute the collapsing of the illy prepared,

top-heavy crumbling of the creatures of their ambition to the general, economic depression. Be the cause whatever it may, they are now insolvent.

It is not necessary that we determine on the facts the right of the creditors of either one of them to subject the property of the one to the debts of the others, nor do we determine this question or express an opinion thereon except for the purpose of the case. It should be admitted it is difficult to conceive of a plan of jointly owned, affiliated corporations for the operation of the business of a utility, more complete than this one. It is, however, mere sophistry to argue that one of the group is technically a separate legal entity, free from the others in the conduct of its or their business with no commingled interest. It is shown that a definite plan had been devised and put into operation by those in charge of the group to induce members of the general public who owned preferred stock in one of the corporations to surrender their preferred and accept therefor common issued by another one of the group, and the purpose thereof was to avoid the payment of the dividends to the owners of the preferred stock, when, in fact, the common, so exchanged for the preferred, was valueless. The dividends paid in the past on the preferred, have been paid partly out of the capital or with borrowed money, without disclosing this fact to the purchasers of the preferred or those exchanging the preferred for the common. It is also shown that one or more of them were executing notes for the use and benefit of each other, and when money was borrowed in the name of one, it was used for another if the officers deemed it necessary. On all of the facts it is our duty to determine whether the chancellor abused a sound discretion in the appointment of a receiver.

In Elkhorn Hazard Coal Co. v. Fairchild, 191 Ky. 276, 230 S. W. 61, 64, the prevailing rule was stated thus:

"The appointment of a reciver is in the nature of a provisional remedy, but is the last of that sort of remedies to be resorted to, and, in the exercise of its legal discretion in granting or denying a motion for a receiver, the court must be guided largely by the facts of the particular case, and keep in mind that the discretion must be exercised only as an auxiliary to attain the ends of justice more com-

pletely, when no other remedy will accomplish that end so satisfactorily. One of the established legal principles controlling the appointment of a receiver is that it should be refused when the plaintiff has another adequate remedy. McClure v. McGee, 128 Ky. 467, 108 S. W. 341 [32 Ky. Law Rep. 1318]; Collins v. Richart, 14 Bush, 621; Floor v. Floor, 87 S. W. 272, 27 Ky. Law Rep. 894; 34 Cyc. 23; Tarvin v.Walker's Creek Coal & Coke Co., 109 Ky. 579, 60 S. W. 185 [22 Ky. Law Rep. 1473]; Harmon v. Ky. Coal, Iron & D. Co., 21 S. W. 1054, 15 Ky. Law Rep. 12. Neither will a receiver be appointed where it appears that a greater injury would probably be caused by the appointment than by leaving the property undisturbed."

In Kentucky Racing & Breeding Ass'n v. Galbreaith, 117 Ky. 66, 77 S. W. 371, 372, 25 Ky. Law Rep. 1212, the general rule governing the right of a creditor of a corporation to the appointment of a receiver is stated thus:

"As a general rule, a creditor of a corporation is not entitled to have its property and assets put in the hands of a receiver until he has reduced his claim to judgment, and procured a return of nulla bona. But there are exceptions to this rule, as where the assets of an insolvent corporation, which a creditor is entitled to have applied in satisfaction of his demands, will probably be lost or fraudulently disposed of by improvident or corrupt officials unless a receiver is appointed, and the creditor has no adequate remedy at law. When this is made to appear, the courts will take charge of the assets of the insolvent company, and apportion them among the creditors entitled thereto. 3 Clark & Marshall on Private Corporations, sec. 785; Veach on Private Corporations, sec. 715; 3 Cook on Corporation, [4th Ed.] sec. 863; 2 Morawetz on Private Corporations, sec. 860; Smith on Receiverships, sec. 227, and authorities there cited."

As to the right of a minority stockholder to have a receiver appointed, the rule is stated in Weisert v. Kraft, 209 Ky. 741, 273 S. W. 462, 464, in this language:

"The court is not at liberty to substitute the judgment of the minority stockholders, or even its own judgment, for that of those intrusted with the con-

trol and management of the corporation. It is the rule in this state that the stockholders of a corporation impliedly agree that the corporation's affairs shall, within the limits defined by its articles, be controlled by the board of directors, and that the corporation shall endure for the purpose for which it is organized for the entire period fixed by its articles, unless sooner dissolved by operation of law, and the judgment of the board as to matters within the powers of the corporation, although unwisely exercised, is in the absence of fraud committed or threatened against the corporation or the minority stockholders, entirely beyond the control of the stockholders through the intervenion of the courts, except in a case where the corporate enterprise is impossible of execution.''

In Metropolitan Fire Ins. Co. v. Middendorf et al., 171 Ky. 771, 188 S. W. 790, another phase of the right of a minority stockholder to the appointment of a receiver was stated substantially in this language: Where it appears that the affairs of a corporation are being fraudulently mismanaged and its assets in imminent danger of being lost to the stockholders through the collusion and fraud of officers or agents, equity will not hesitate to assume charge and control of the property through a receiver appointed at the instance of minority stockholders.

Another settled rule is, a court of equity has no jurisdiction in the absence of a statutory power to decree dissolution of a corporation and the distribution of its assets at the suit of one or more of the stockholders. Oldham v. Mt. Sterling Imp. Co., 103 Ky. 529, 45 S. W. 779, 20 Ky. Law Rep. 207. Also ''in absence of insolvency or some peculiar equity, simple unsecured contract creditors of corporation, whose claims have not been reduced to judgment and who have no lien on property of corporation, are not entitled to have receiver appointed * * * under Civil Code Prac. sec. 298.'' Black Hawk Coal Co. v. Hazard Fruit Co., 205 Ky. 447, 266 S. W. 3. Nor will equity ''interfere with the management of a corporation, because it is not being successfully operated, unless there is actual fraud, or such a wasting of the corporate property as practically amounts to fraud.'' Graham, etc., v. McAdoo, etc., 135 Ky. 677, 123 S. W. 260.

In Clark on Receivers (1st Ed.) secs. 4-10, inclusive,. the history of the jurisdiction of courts of equity and. the power to appoint a receiver is traced.   This author: writes:

"The appointment of a receiver is not an equitable: right, * * * thé appointment of a receiver being in- terlocutory is therefore a demure expedient and: provisional to some other or final judgment of the: same by the court. * * * It is not the office of the court of equity to appoint receivers of the mode of granting ultimate relief.   They are appointed as a. measure, ancillary of the enforcement of some: recognized equitable right."

As said in Tardy's, Smith on Receivers, vol. 1, p. 26: "Following the principles pertaining to equity jur- isdiction it is fundamental a receiver will not be ap- pointed * * * where the court can find no other or less strenuous means."

The statement of the law enunciated in the fore- going must be regarded in connection with the facts in. the particular case.

From them and many other authorities that might. be cited, it is deducible that the appointment of a re- ceiver is the exercise of an extraordinary, drastic, and. sometime harsh power which courts of equity possess. and is only to be exercised where the failure to do so will place the complaining party in a position of suffer- ing irreparable loss or injury.   There is a clear distinc- tion between its jurisdiction to appoint a receiver where the corporation is a solvent, going concern, and where: it is insolvent.   It is a generally recognized rule that a. court of equity has inherent jurisdiction at the instance of stockholders (or creditors) where the facts call for the exercise of its jurisdiction to appoint a receiver of either a solvent or insolvent corporation "on the ground of fraud, gross mismanagement or dissension among the stockholders, directors or officers, if there is no other adequate remedy."   Adams v. Farmers' National Bank,. 167 Ky. 506, 180 S. W. 807; Metropolitan Fire Ins. Co. v. Middendorf et al., supra; Haldeman v. Haldeman,. 176 Ky. 635, 197 S. W. 376.

"A corporation whose assets are insufficient to pay its debts, and which has ceased to do business, or has. taken, or is about to take, a step which will incapacitate

it from conducting the corporate enterprise with reasonable prospect of success, or its financial embarrassment is such that early suspension and failure must ensue," is as a matter of law insolvent. 7 R. C. L. 746; Parrish v. Commonwealth, 136 Ky. 77, 123 S. W. 339.

It is practically admitted that the entire group of corporations here involved, are so financially embarrassed that all of them have suspended business except one. The evidence abundantly establishes that this one is in such financial embarrassment that the appointment of a receiver is the best and last resort and necessary for the preservation of its assets. Without taking into consideration the past conduct of the officers in charge of the group in determining what the present situation is and the future will be, and without any reflection on them or things done or attempted to be done by them in the past, and considering only the present situation and the prospects for the future, we are convinced they are such as to warrant the act of the court taking, by and through a receiver, the control of the properties of the corporations, as directed in the order appointing the receiver.

With this view, the judgment is affirmed.