CUMBERLAND PUBLISHING CO., Inc., et al., Appellants,

v.

ADAMS REAL ESTATE CORPORATION, Appellee.

Court of Appeals of Kentucky.

May 3, 1968.

As Modiifcd Nov. 15, 1968.

Edward R. Hays, Baird & Hays, Francis M. Burke, Francis D. Burke, Pikeville, for appellants.

O. T. Hinton, Pikeville, for appellee.

PALMORE, Judge.

Adams Real Estate Corporation, as a minority stockholder in Cumberland Publishing Company, Inc., of Pikeville, Kentucky, brought this action against Cumberland and its officers and directors demanding among other things that the management and control of the defendant corporation be placed in the hands of a receiver, that an audit of its financial affairs be conducted, and that the defendant John Ward, its president and chief stockholder, be required to make restitution for money and property alleged to have been improperly obtained from it. Various issues were joined by the pleadings, and after hearing the evidence the chancellor entered findings of fact, conclusions of law and a final order under CR 54.02 appointing a receiver to take charge of and conduct Cumberland's affairs until further order. The defendants appeal.

Cumberland's capital stock outstanding consists of 176 shares, of which 45 shares are owned by Adams (a corporation owned solely by Stuart Adams) and the remaining 131 shares by Ward. 33⅔ shares of Ward's stock were acquired from the estate of his mother, Gladys Ward, during or just prior to the present litigation. The 45 shares held by Adams were purchased from Mrs. Allie Jordan in August of 1967. The controversy developed in the following manner:

Cumberland was incorporated in 1920. For a time it owned a newspaper and a radio station, but the newspaper was sold in 1964 and the company's business now is confined to the operation of the radio station. The radio facilities are located on a tract of land in or near Pikeville which was owned by Mrs. Gladys Ward and on which her home was situated. That portion of the property embracing the radio station was and is leased to Cumberland. On July 22, 1967, following Gladys Ward's death, Adams purchased for $145,000 the undivided half interest inherited by John Ward's brother in the tract containing their late mother's residence and the radio station, subject of course to the lease. Three days later Adams brought suit to have the tract sold as indivisible. Then, on August 14, 1967, for $60,000 cash, Adams purchased Mrs. Jordan's 45 shares in Cumberland, requested that a new stock certificate be issued accordingly, and sought to examine Cumberland's books and records. Encountering difficulty and delay in obtaining the stock certificate and in gaining access to the corporate records, Adams brought this suit alleging that the defendant officers had refused to transfer the 45 shares on the books of the corporation and had refused to permit an examination of its records, that the corporation had been and was being grossly mismanaged and was insolvent, that John Ward had misappropriated funds and assets of the corporation, that he and his wife, Georgia, had made excessive withdrawals from the corporation aggregating over $100,000, that the corporation had not had proper elections of directors and officers for many years, that the appointment of a receiver would be necessary in order to effect an examination and audit of the cor-

porate affairs, and that any further participation by the individual defendants in the management of the business would result in irreparable loss to the minority stock interest.

The matter of issuing a new stock certificate to Adams was resolved during the course of the proceedings in the circuit court. The defendants having indicated grounds for objection to the accountant Adams had selected to examine the corporate records, the chancellor suggested the names of other qualified accountants, and the parties accepted Robert F. Linton, a certified public accountant of Pikeville, for that purpose. At the time of the last hearing, on March 2, 1968, Mr. Linton had made a preliminary examination and had arrived at various conclusions but said it would require from three weeks to six months or even, possibly, a year to complete a detailed audit and give unqualified opinions.

The officers of Cumberland, aside from John Ward, are James Balser, Vice President, Georgia Ward, Secretary, and David Authenrieth, Treasurer. Balser serves as general manager under the supervision and control of John Ward. He is something of a neophyte in the radio business, having been employed by the company in July of 1965 upon his retirement from an Army career. He depends very materially on John Ward's experience and knowledge of the radio field, especially with regard to the rules, regulations, policies and requirements of the Federal Communications Commission. Authenrieth is a certified public accountant and became treasurer of the corporation on July 1, 1967, since which date he has had complete charge of its funds and has signed all of its checks. As of December 26, 1967, just prior to the first evidentiary hearing in this case, he prepared the following balance sheet:

"ASSETS

| | | |
|---|---|---|
| Cash | | $ 265.37 |
| Accounts Receivable – Trade | | 17,500.00 |
| Notes Receivable – Pike County News, Inc. | | 20,000.00 |
| Notes Receivable – John Ward | | 14,923.56 |
| Notes Receivable – John M. Ward – Secured | | 84,689.00 |
| Equipment, Etc. | $ 87,543.47 | |
| Less Depreciation | 61,298.90 | 26,244.57 |
| Treasury Stock | | 19,000.00 |
| | | $182,622.50 |

LIABILITIES

| | | |
|---|---|---|
| Accounts Payable | | $ 4,783.43 |
| Notes Payable – Pikeville National Bank | | 25,107.08 |
| Notes Payable – S. B. A. | | 11,824.79 |
| Notes Payable – G. M. A. C. | | 2,702.88 |
| Capital Stock | $ 20,000.00 | |
| Surplus | 118,204.32 | 138,204.32 |
| | | $182,622.50" |

Authenrieth had made up the books and tax reports for Cumberland before July 1, 1967, but was made treasurer and given control of its expenditures at that time because John Ward had become ill and required hospitalization. Authenrieth testified positively that Cumberland is solvent and able to pay its obligations as they fall

due. On March 2, 1968, when the second evidentiary hearing was conducted, the $14,923.56 note of John Ward listed in balance sheet had been paid off, the balance owing on the note payable to the Pikeville National Bank had been reduced by $7,500, a 6% dividend had been paid, and (naturally) the cash on hand account was in better shape than it had been at the year-end.

The indebtedness of John Ward to Cumberland accumulated over the years as the result of his drawing corporate funds for the payment of personal expenses. However cavalier this practice may have been toward those who held minority stock interests at the time, thus far there is no evidence of any attempt at concealment. On the other hand, the more careful attention which has been given the financial records incident to this lawsuit has precipitated further adjustments increasing Ward's liability to something between $100,000 and $110,000. By the same token, on paper at least these adjustments increase the corporate assets and enhance its profit and loss positions (at the same time possibly creating income tax deficiencies) for the years they affect. About $11,000 of the total adjustment reflects the payment of premiums on group insurance policies payable to beneficiaries other than the corporation.

$84,689 of Ward's liability has been reduced to the form of a 6% note payable in fifteen annual installments, secured by a pledge of Ward's stock, the certificates for which are in the corporate treasurer's possession.

Authenrieth also made up an income statement for the year 1967 showing a loss of some $4,800. This statement was discussed by the witnesses, but unfortunately it was not introduced in evidence, so we are unable to comment upon it except to say that presumably the final figure will be affected to some extent by the adjustments mentioned above.

The record does not show the period over which John Ward has controlled and managed Cumberland's affairs, but the parties have focused on 1963 as a benchmark because in that year some of the records covering previous years were lost in a flood of the Big Sandy River. According to accountant Linton, the surplus at the end of 1967 was $34,000 less than it was at the end of 1963, subject to the adjustments we have discussed. Authenrieth testified that $30,000 of this decline resulted from the writing off of bad debts inherited from the newspaper business. At any rate, it does not thus far appear with any degree of assurance that it reflects substantial operating losses. Linton testified categorically that the corporation is not insolvent and that all of the records necessary to conduct a detailed audit have been made available to him.

Testifying for Adams, the operators of two other radio stations in the same general area as Pikeville gave opinions to the effect that Cumberland's radio station ought to be operating at a substantial profit. All that either of them knew about the affairs of Cumberland was derived from a look at the 1967 income statement which, as we have said, was not introduced in evidence.

Ward offered, by a motion to that effect, to submit to an injunction prohibiting any future diversion of corporate funds to the personal use of himself or his family and tendered a bond, open in amount, with substantial sureties guaranteeing compliance. The motion was overruled. As of the time the evidence was taken it seems clear that this questionable practice had ceased, except perhaps for the matter of clarifying the status of a Cadillac automobile that is used by the Wards but is being paid for by the company under the installment plan. Ward draws a salary of $300 per week. Georgia Ward does not draw any salary and, so far as the evidence discloses, has not directly received any of the corporate funds.

The trial court determined that (1) no stockholders' meeting has been held in recent years to elect directors, no directors have been qualified by any oath of office or acceptance of their appointment, and hence

**812**

there is no legally constituted board of directors or officers of the corporation at this time; (2) the expenditure of corporate funds for the personal use of Ward was improper and fraudulent as to the minority stockholders; (3) the business of the corporation has been grossly mismanaged during the past four years; (4) the belated efforts of Ward to straighten out his account with the corporation and to secure the minority stockholder against future diversion of funds "will not remedy the evil which his fraudulent acts have created and will not furnish any guarantee that there will not be a repetition of these practices;" (5) the records have been kept in such a manner that no proper accounting can be made without an unreasonable and expensive accounting procedure; (6) it is impossible to determine the question of solvency at this time without a lengthy and expensive audit; and (7) the appointment of a receiver "is necessary in order to protect the interests of the plaintiff and other stockholders [sic] and creditors." This last finding, though designated as one of law, is of course the central factual determination.

The foregoing outline will provide a sufficient introduction to the legal problem that must be decided. It is important that the problem be precisely defined, because it boils down to a very narrow question. It is not whether John Ward has mismanaged the company, and should be punished, but whether Adams can be given adequate protection by some or any means short of the appointment of a receiver.

"That a temporary receiver may be appointed even for a solvent corporation, where there is gross mismanagement or fraud by the directors, is well settled." Adams v. Farmers' Nat. Bank, 167 Ky. 506, 180 S.W. 807, 811 (1915). "The general rule is * * * that the courts will not interfere with the management of a majority, unless there is actual fraud, or such a wasting of the corporate property as practically amounts to fraud." Graham v. McAdoo, 135 Ky. 677, 123 S.W. 260, 262 (1909).

"One of the established legal principles controlling the appointment of a receiver is that it should be refused when the plaintiff has another adequate remedy. * * * [T]he appointment of a receiver is the exercise of an extraordinary, drastic, and sometime harsh power which courts of equity possess and is only to be exercised where the failure to do so will place the complaining party in a position of suffering irreparable loss or injury. There is a clear distinction between its jurisdiction to appoint a receiver where the corporation is a solvent, going concern, and where it is insolvent." Oscar C. Wright Co. v. Steenman, 254 Ky. 381, 71 S.W.2d 991, 994, 995 (1934).

"The appointment of a receiver, which is a harsh and extraordinary course of action for a court to pursue, is generally regarded as a remedy of last resort. Accordingly, a receiver should not be appointed where there is available another safe, expedient and adequate remedy." Dulworth & Burress Tobacco Warehouse Co. v. Burress, Ky., 369 S.W.2d 129, 132 (1963), citing further authority to the effect that a receiver will not be appointed if a bond or other security will accomplish the necessary protection.

It was held in the *Dulworth & Burress* case, last cited, that it is incumbent upon a plaintiff seeking appointment of a receiver to show that some of the corporation's property is "in imminent danger of being lost, removed or materially injured, and that only the immediate appointment of a receiver would avert and prevent a harmful result to his rights." 369 S.W.2d at p. 132.

Reviewing the findings of the trial court in the same order in which they are listed above, we conclude as follows:

(1) If it were true that a corporation had no legally constituted officers or directors and its management were in the hands of usurping volunteers, it might very well be appropriate to put it in the control of a

receiver for the brief period required for the holding of a shareholders' meeting and election, but there is no evidence whatever in this case to sustain the conclusion that there are no officers or directors. We have not been referred to any authority suggesting that the failure to hold shareholders' meetings divests the incumbent officers and directors of their powers. To the contrary, our statutes provide that a director shall hold office until his successor is elected and accepts the election. KRS 271.345(1). Nor have we been cited to any requirement that a director or other officer must take an oath of office, or accept his trust in any formal manner. In the absence of further enlightenment on the subject it would appear to us that a duly elected director sufficiently accepts the office by the simple act of serving. The trial court's findings on this point are based upon faulty legal premises and are clearly erroneous.

(2) The finding that Ward's use of corporate funds for his personal expenses was improper and tantamount to a fraud upon the minority stockholder is justified. We use the expression "tantamount to" because there is no evidence indicating any actual fraud or intentional wrongdoing by Ward.

(3) The finding that the corporate business has been grossly mismanaged during the past four years also is supported by the evidence, but only in the sense that such mismanagement consisted of Ward's use of corporate funds for his own benefit, thus becoming indebted to it and reducing its working capital. The opinions of the two other radio station operators that Cumberland ought to be making considerable profit simply did not rest on sufficient knowledge of Cumberland's internal affairs to support the finding on that particular basis. Whether and the extent to which the company has operated at a loss depend on the adjustments we have mentioned heretofore and cannot be determined until the auditing procedures have progressed

further than they had gone at the time the evidence was heard.

(4) Ward's efforts to correct his position with the corporation certainly will not at once put it in the cash position it would have enjoyed in the absence of his free-wheeling use of its funds, but we are unable to discern the basis for finding that they will not remedy the evil or provide any guaranty against a repetition of the same practices. Regardless of his misguided attitude in the past, the evidence discloses no reason to suspect that he would not obey an injunction or that his bond would not constitute an adequate guaranty.

(5) The certified public accountant suggested by the chancellor and accepted by the parties testified that the records necessary for a proper audit have been made available to him. The finding that no proper accounting can be made without an unreasonable and expensive procedure could be sustained only on the theory that all audits, being expensive, are unreasonable. We are not disposed to say that. Indeed, one of the main purposes of the suit was to secure an audit, it has begun, and there has been no suggestion by the parties or by the trial court itself that it be discontinued. At best, therefore, the finding is irrelevant.

(6) The finding that it is impossible to determine the question of solvency without an audit is not supported by the evidence. While it is true that an exact statement cannot be certified until the audit is completed, the two accountants, who were the only qualified witnesses to testify on the subject, agreed without reservation that the company is solvent.

(7) Construing the word "necessary" in the strict sense required by the principle that a solvent corporation will be placed in receivership only as a last resort, we have concluded that the trial court's ultimate factual determination that a receiver is necessary at this stage of the proceeding is clearly erroneous. There has been no substantial showing that Ward is not compe-

tent to manage the affairs of the company, and no good reason for it to be deprived of his knowledge and experience. The only type of protection the evidence proves to be necessary is against the improper use of corporate funds, and there are adequate means short of a receivership by which that can be provided. Adams is entitled to protection, but Ward's 75% proprietary interest also is entitled to consideration.

It is argued that only a receiver could or would pursue the collection of Ward's debts to the company, and seek to set aside the arrangement under which he proposes to pay $84,689 of his indebtedness over a period of fifteen years. There is a remedy by which that can be done without a receiver, through a stockholder's derivative suit in the name of the corporation. KRS 271.605; Security Trust Company v. Dabney, Ky., 372 S.W.2d 401, 403 (1963). Meanwhile, the company does have the pledge of Ward's stock to protect it. When the audit is completed and further evidence is taken a different picture may be presented that will justify the appointment of a receiver, in which event the trial court may subject Ward to reasonable alternative conditions, such as the appointment of an impartial proxy committee to hold and vote the corporate stock, the substitution of a new payment schedule with more or different security, and the continued handling and control of the corporate funds by some responsible officer or person other than himself. In the interim, however, things remaining as they are, there is not sufficient cause to relieve Ward and the present directors of their right to manage the company.

We have not dwelt on the situation of Adams, but as this is an equitable proceeding his posture has not escaped attention. He purchased his stock from a disgruntled stockholder who told him she had not received a dividend for 15 years and that Ward had borrowed over $100,000 from the company. It is a thin line that separates his solely-owned company from the position of one who knowingly buys a law-suit. Though its rights as a minority shareholder are the same as were those of Mrs. Jordan, its claim for instant protection seems faintly off key.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

All concur.