# BancoKentucky Co.'s Receiver v. National Bank of Kentucky's Receiver, and four other cases.

Oct. 27, 1939.

786

Trabue, Doolan, Helm & Helm for Chemical Bank & Trust Co.

David R. Castleman and David R. Castleman, Jr., for BancoKentucky Co.'s receiver.

Nichols, Woods, Marx & Ginter and Harry Kasfir for National Bank of Kentucky's receiver.

OPINION OF THE COURT BY JUDGE FULTON—Reversing in part and affirming in part.

The five appeals captioned above grow out of the liquidation of the National Bank of Kentucky and BancoKentucky Company and on motion were heard together and are therefore covered by one opinion.

For brevity and convenience of statement the following abbreviations are used throughout the opinion:

"Banco" means the BancoKentucky Company.

"Receiver" means Shackelford Miller, Jr., Receiver of the BancoKentucky Company at the time of the rendition of the judgments. (The Kentucky Title Trust Company was by agreement substituted as Banco's receiver while the appeals were pending, but for convenience Miller is referred to in the opinion as being Receiver.)

"Chemical" means the Chemical Bank and Trust Company of New York.

"Bank" means the National Bank of Kentucky.

"Keyes" means Paul C. Keyes, the original receiver of the National Bank of Kentucky, who acted as such at the time of most of the transactions herein involved.

"Anderson" means A. M. Anderson, the present receiver of the National Bank of Kentucky, who succeeded Keyes upon the latter's resignation, December 15, 1932.

"Laurent" means Joseph S. Laurent, receiver of the BancoKentucky Company until the appointment of his successor, Shackelford Miller, Jr., on September 30, 1935.

"Petition" means the petition filed by the Banco-Kentucky Company for the appointment of a receiver for the company.

On November 17, 1930, the Bank closed its doors and began liquidation under the administration of Keyes, appointed by the Comptroller of the Currency, and at that time Banco owned 37,721.624 of its 40,000 shares of capital stock. On February 20, 1931, Banco was assessed with statutory liability on these shares in the amount of $3,772,164.40. This is the basis of the main claim of Anderson against Miller. In addition to this main claim Banco was also indebted to the Bank at the time it closed on several banking transactions to the extent of $131,369.19.

As a result of the closing of the Bank, Banco was placed in a precarious position which resulted in the filing of the petition on November 24, 1930, by six stockholders of Banco, individually and as the executive committee of Banco, against Banco and Chemical, praying that a receiver be appointed for Banco "to take charge of all its assets, books, papers and effects and to hold, manage, and dispose of same under the supervision of this court." The six directors were also stockholders and directors of the Bank. Chemical at once entered its appearance to this action.

Banco was incorporated in Delaware in July, 1929, and began business about October 1 of that same year. In addition to its holdings in the Bank, it was also the owner of 16,326.77 out of 17,000 shares of the Louisville Trust Company, its holdings being approximately 95 per cent of the Bank and 92 per cent of the Trust Company, and it had extensive investments in stocks of other banks located mostly in the Ohio Valley, but the Bank was the keystone of the structure, being larger than all the other banks in the chain combined. All directors of the Louisville Trust Company and the Bank were directors of Banco.

From the beginning to the end the chief officers of Banco were James B. Brown, president, Charles F. Jones, vice-president, and W. T. ZurSchmiede, secretary-treasurer, and during the same period, Brown was president of the Bank, Jones was vice-president of the Bank and ZurSchmiede its cashier, these three being the

only executive officers and the only persons authorized to sign its checks and disburse its funds. Banco had no separate place of business, but kept all of its records, books, papers and securities in the vaults of the Bank where they were accessible to Brown, Jones and Zur-Schmiede.

On October 10, 1930, at a meeting of the board of directors of the Bank, attended by all except five of the directors, the following resolution was adopted:

"Resolved: That the officers of the BancoKentucky Company be requested to borrow $1,000,000.00 for the BancoKentucky Company and to use the proceeds for the purpose of purchasing certain assets from the National Bank of Kentucky."

The adoption of this resolution and subsequent transactions in carrying out its purpose were brought about as a result of a threatened impairment of the Bank's surplus. The Bank had a large amount of slow and doubtful assets and its condition was not satisfactory to national bank examiners, who had been threatening for some time to require the Bank to charge off a large amount of doubtful assets to surplus. The officers and directors of the Bank, fearing that a reduction of surplus would drastically affect the Bank and might start a run on it, acquainted the bank examiners with the plan to organize Banco with the prospect that it would acquire the slow and doubtful assets of the Bank. In reliance upon representation of this character, the bank examiners withheld action as to requiring a charge off of these doubtful assets to surplus and made a report to the effect that in view of the contemplated organization of a holding company which would take a number of years to work out certain doubtful assets of the Bank, they were withholding action as to requiring the charge off of these doubtful assets to surplus. There seems to be little doubt that one of the main purposes for which Banco was formed was to render financial help to the Bank as well as to act as a holding company to the other banks which it expected to acquire. Numerous directors of the Bank testified that one of the main purposes of the organization of Banco was that it should "come to the aid and assistance of member banks in times of stress."

Pursuant to the above quoted resolution, on October

22, 1930, Banco borrowed from Chemical $600,000 on its demand note, pledging a large amount of collateral. (On June 17, 1930, Banco had borrowed from Chemical $1,000,000 secured by a pledge of collateral.)

Among the assets of the Bank criticized by the bank examiners were $580,000 of Murray Rubber Company debentures and a $20,000 interest of the bank in a note of Lewis Humphrey. (These two items will be considered as one item and designated as the Murray Rubber Company item of $600,000.) The $600,000 borrowed from Chemical was used by Banco to take over from the Bank the Murray Rubber Company item and it is stipulated that "at said time and for long prior thereto, the said debentures and note of the Murray Rubber Company were without value." Nothing was ever realized by Banco on this item. At the time of this transaction the bank examiners made a written report to the officers and directors of the Bank that the Murray Rubber Company loan was a complete loss.

At the outset of the discussion of this question we may say that we have no difficulty in accepting and believing the testimony of the bank directors that in voting for this resolution and in carrying through this transaction they had no intent to defraud Banco. Even in the absence of testimony, we would have great difficulty in believing that men of the eminence and high character of these directors had any sinister or ulterior purpose whatsoever in mind. Our examination of the record makes it clear to us that the nine directors who were present at the meeting acted with worthy and personally disinterested motives. We have no doubt that it seemed to them that a transfer of "slow" assets from the Bank to Banco, where they might be worked out more advantageously, would not only be beneficial to the Bank but indirectly beneficial to Banco by reason of its large holdings of bank stock. Mr. Speed in his testimony expressed this view.

It will be observed, however, that Mr. Speed testified that he did not realize the worthlessness of the Murray Rubber Company item. He thought, as no doubt did the other directors, that the Murray Rubber Company item was in shape to "work out." He states that he received this information at board meetings and did not know that ostensible security on the Murray Rubber

Company item had been released by the Bank, although the Bank examiners had made a written report to the board of directors in which this item was branded as worthless. The finding in the Special Master's report with reference to this transaction is that "this is but an episode in the long course of misrepresentations and concealment by the chief officers of the Bank of which Speed and his fellow directors and, through them, the creditors and shareholders of the Bank were victims." This finding seems to be justified by the evidence.

As pointed out by the Special Master in his report, there is a vast difference between a transfer of "slow" assets and a transfer of worthless assets, and, whatever might be said in defense of the former in the circumstances then supposed by some of the directors to exist, little can be said in defense of the latter.

We have, as far as the equities of the situation are concerned, two persuasive equities opposing each other, one in favor of sustaining the action of Banco in taking over these worthless securities and the other demanding with equal, or perhaps greater, persuasiveness that the transaction should be held to be of no effect.

The first equity we have in mind has heretofore been indicated in our statement that the nine directors present at the time of the adoption of the resolution acted with worthy and personally disinterested motives and under the belief that the transaction, as well as being a benefit to the Bank, was also a benefit to Banco, whose structure would topple if the Bank were permitted to become insolvent.

The other equity, supporting the conclusion that the transaction should be declared to be a nullity, is that it did not accomplish its purpose and insolvency of both institutions shortly followed with the Bank holding $600,000 of Banco's money for which no consideration had actually passed, the transaction being supported only by the belief of the officers and nine of the directors that it would be a benefit to both the Bank and Banco, a belief which turned out to be unfounded.

The situation here revealed is one which must be solved by the application of strict legal principles. The Special Master was of the opinion that Banco should re-

cover this sum from the Bank but the chancellor sustained exceptions to this finding, the substance of his opinion being that, as there was no resolution of the Banco board authorizing the transaction and as it could not be regarded as a dealing in sound investment securities, the only question was whether Brown as president had power to consummate the deal. The chancellor concluded that such authority could be drawn from the following sources only: (1) his office as president of Banco, (2) the general charter purposes of the corporation and its general course of the dealing, and (3) the business practices of the local community. He then found that as the deal was in furtherance of the charter power of Banco and as the $600,000 was of such small magnitude in comparison with the $53,000,000 asset value of Banco, the president had power to consummate the deal without action by the board, in view of local practices of which he took judicial notice, that presidents of corporations exercise wide powers to carry on charter activities without board approval as to individual transactions. In conformity with this view the chancellor rendered judgment for the Bank on this item.

The argument of the Bank to sustain the position taken by the chancellor is that the by-laws of Banco provided that the president "shall have general supervision over the business and affairs of the corporation."

It is urged that this by-law conferred on Brown as president of Banco the powers of a general manager of the business and affairs of the corporation. In Kentucky River Coal Corporation v. Williams, 226 Ky. 93, 10 S. W. (2d) 617; and Kentucky-Pennsylvania Oil & Gas Corporation v. Clark, 247 Ky. 438, 57 S. W. (2d) 65, the rule is stated that a general manager only has implied power to do what is usual and customary in business. It becomes difficult at times to determine whether an act is within or beyond the powers of corporate officers to whom wide powers are conceded by directors, and it must be admitted that the record discloses that wide powers were bestowed on the corporate officers of Banco. The extent of authority at times becomes vague and difficult to determine. However, in Elk Valley Coal Company v. Thompson, 150 Ky. 614, 150 S. W. 817, it was held that the vice-president and general manager is without authority to sell and dispose of all its assets

even though full power to conduct the company's business has been granted by formal action of the directors.

In the light of these authorities we are unable to agree with the chancellor's finding that the transaction in question was within the power of the president to consummate, under the by-laws of Banco which vested in the president only the general supervision of the business, thereby conferring on him only the power of a general manager. While it may be conceded that presidents of corporations customarily exercise wide powers without board approval, yet, as pointed out, such powers are limited to doing acts customarily done in the business. It is our opinion that the voluntary purchase of worthless assets involved in this transaction, amounting in the circumstances to neither more nor less than a gift, was unusual and extraordinary even though it was done for the ostensible purpose of benefitting Banco. The transaction was not a usual and customary transaction for Banco or for any other institution of like character in this state. In fact, we doubt if any other transaction of like character had ever been consummated in the City of Louisville.

The cases cited by counsel for the Bank do not appear to us to militate against the soundness of the conclusions we have enunciated. In Kentucky Consumers' Oil Company et al. v. Continental Fuel Company, Sallie J. Thompson et al., 171 Ky. 748, 188 S. W. 855, it was merely held that the president and general manager of a corporation engaged in mining and selling coal, in the absence of any limitation of authority, had authority to assign an ordinary open account to a creditor of the corporation. This was the equivalent of paying an ordinary account, which is undoubtedly within the power of a corporate officer. In comparing the last mentioned case to the instant case, it is urged that as the business of Banco was to acquire securities, the purchase of securities by the president cannot be challenged. We do not dispute this argument but the answer thereto is that the transaction in question here was in no wise a purchase of securities—it was merely taking over securities admitted to be worthless, a fact known to the president.

In Seat et al. v. Louisville & Jefferson County Land Company, 219 Ky. 418, 293 S. W. 986, it was held that the president of a real estate corporation whose busi-

ness included that of buying, sub-dividing and selling real estate could bind the company by an instrument dedicating a street and imposing restrictions upon the company's property. Such action by the president, however, was in direct furtherance of the very purpose and object of his company and such deals are usual and customary with companies of a similar character.

In Gilmore & Company v. W. B. Samuels & Company, 135 Ky. 706, 123 S. W. 271, 21 Ann. Cas. 611, it was held that officers of a corporation engaged in manufacturing and selling whisky had power, without express authority, to enter into a contract for the sale of the entire output of the distillery for five years. Here again the officers were merely handling the usual and customary business of the distillery in selling whisky under the express authority of the directors to do such acts as were necessary to the proper and successful conduct of the company's business. The peculiar circumstances in that case should also be considered as bearing on the extreme lengths to which the court went in that opinion in upholding the transaction. The president who signed the contract and her son who negotiated the contract, and who was general manager, between them owned all the stock of the corporation except a small amount held by nominal stockholders for the purpose of perfecting the organization. In addition thereto the president and her son were, by resolution of the directors, authorized *to sign the corporate name to all papers pertaining to the business of the corporation.*

The conclusions we have arrived at concerning this transaction have been reached without regard to the fact that these officers, whom Anderson claims had power to consummate the transaction without approval of the Banco board, were also officers of the Bank, presenting the situation of two corporations with interlocking directorates dealing with each other. Our conclusions are fortified by the existence of this situation.

It is undoubtedly the general rule that where transactions have occurred between corporations having interlocking directorates, those who would sustain them must show their fairness when the good faith of the transactions are questioned. Tower Hill-Connellsville Coke Company of West Virginia v. Piedmont Coal Company, 4 Cir., 64 F. (2d) 817, 91 A. L. R. 648; Corsicana

National Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141; Trapp, etc., v. Fidelity National Bank, etc., 101 Ky. 485, 41 S. W. 577, 43 S. W. 470, 19 Ky. Law Rep. 1114. In answer to this it is urged by the Bank that examination of these authorities and many others of a similar import discloses that there was present in all of them a sinister or ulterior motive on the part of the interlocking officers and directors consummating the deal (and there is much force in this position) and the claim is made that a motive of this character is utterly lacking in the transaction here involved. We have heretofore indicated that this has every appearance of being true so far as the Bank directors were concerned, but it must not be overlooked that the record discloses that some, at least, of the directors of the Bank who voted for the resolution did not regard the Murray Rubber Company item as worthless. It may therefore be said that the officers of the Bank had concealed material facts from the directors, and, considered in that light, it is apparent that the Bank's officers were desirous of preventing a complete disclosure of the mismanagement indulged in by them to the Bank directors. No better method could have been devised than the transfer of these worthless assets to Banco over which they also had almost complete control. By this means disclosure of their mismanagement might be indefinitely postponed.

In the circumstances, as the president was acting as a dual agent, he owed to both Bank and Banco the duty to disclose all facts which might reasonably affect the judgment of each principal. See A. L. I. Restatement of the Law of Agency, Vol. 2, Sections 387-394; 2 C. J. S., Agency, Section 15, p. 141. The evidence shows that he failed in that duty to both principals by not disclosing the identity and character of assets proposed to be sold and purchased and by failing to disclose to Banco that the transaction was in contemplation. In these circumstances it seems clear that neither Brown as president nor the other officers of Banco had power to make the deal for Banco and, since a majority of Banco's directors did not take part in the adoption of the resolution, the transaction cannot be sustained.

Anderson relies on the five-year statute of limitation applying to actions for relief from fraud (Kentucky Statutes, Sections 2515 and 2519). The basis of this,

plea is that Miller's claim was not properly asserted until the filing of his amended answer, counter-claim and set-off on May 5, 1936, which was more than the five years after the discovery of the alleged fraud, since the discovery must have been made on or before February 24, 1931, the latter date being adopted because that was the date on which Laurent filed an action to recover from the directors of Banco on numerous grounds, including the Murray Rubber Company item.

We may point out, however, that after Anderson filed his claim, Miller on March 9, 1935, within the five years, filed exceptions to the claim filed by National Bank of Kentucky's Receiver in which was set out in detail the facts and circumstances involved in the transfer of the Murray Rubber Company item to Banco and this pleading claimed a set-off of $600,000 against the Bank's claim. This practice is undoubtedly permissible under decisions of this court, holding that all questions of law and fact affecting claims filed may be raised either by answer or by exceptions. Horner v. Harris' Ex'r, 10 Bush 357; Bailey's Adm'r v. Hampton Grocery Company et al., 189 Ky. 261, 224 S. W. 1067; Callender's Adm'r v. Callender, 70 S. W. 844, 24 Ky. Law Rep. 1145.

This pleading denominated "objections and exceptions" was subsequently amended and styled "amended answer, counter-claim and set-off" and did not state a new ground of relief, but merely perfected a cause of action already defectively set out. In these circumstances the amendment relates back to the filing of the original pleading and the cause of action stated in it is not barred since the original pleading was filed in time. Black Star Coal Company v. Garland, 235 Ky. 204, 30 S. W. (2d) 900; Newman's Pleading and Practice, Section 613.

The next position taken by Anderson is that Laurent by a suit filed by him against the directors of Banco, in which he sought recovery from these directors for misconduct in handling the affairs of Banco, one of the grounds of recovery sought being that the directors were guilty of fraud in consummating the Murray Rubber Company transaction, made an election which precluded the assertion of his claim against the receiver of the Bank.

The doctrine of election is based upon the assumption of an inconsistency between two proceedings. A litigant is not permitted to invoke the aid of the court upon two contradictory theories based upon the same facts. We perceive, however, no inconsistency between the claim that the officers or directors of the Bank were guilty of fraud in this transaction and the claim that the officers or directors of Banco were guilty of fraud or negligence in the same transaction or that the transaction was beyond the power of the officers to consummate—the two claims are not based on contradictory theories. If it was true, as alleged, that the two groups, sued in different capacities, had perpetrated a fraud on Banco, both groups were liable and an action against one would not preclude an action against the other unless full satisfaction had been obtained in the first action.

The theory of election as above indicated is well established in Kentucky. Stratton v. Stratton's Adm'r, 149 Ky. 473, 149 S. W. 900; Curd, etc., v. Field, 103 Ky. 293, 45 S. W. 92, 19 Ky. Law Rep. 2016. It might be added that the authorities generally are in accord with the principles enunciated in our jurisdiction. First National Bank v. Flynn, 190 Minn. 102, 250 N. W. 806, 92 A. L. R. 1272; Newhouse v. First National Bank, D. C., 13 F. (2d) 887; Sweet v. Montpelier Sav. Bank & Trust Co., 69 Kan. 641, 77 P. 538; Foshay Trust & Savings Bank v. Public Utilities Consol. Corporation, 8 Cir., 64 F. (2d) 665. In the only Kentucky case cited by the Bank, Riley et al. v. Cumberland & Manchester Railway Company, 234 Ky. 707, 29 S. W. (2d) 3, it was held that an action for specific performance of a contract was inconsistent with a subsequent action for damages for breach of the same contract, and, if prosecuted to judgment, it constituted an election which barred the second action. The decision was based solely and alone on the grounds of inconsistency. Cases cited by the Bank do not militate against the principles enunciated except in two instances. Namely, Union Guardian Trust Company v. First National Bank-Detroit, 271 Mich. 323, 259 N. W. 912, and Crane v. Atlanta & Lowry National Bank, 40 Ga. App. 83, 149 S. E. 58. Under the peculiar facts of the first case, it appears that it is probably not in point, but accepting the facts and conclusions reached to be as stated in brief, we are not in accord therewith.

In the Georgia case the plaintiff sued an attorney who had endorsed a check without plaintiff's authority and pocketed the money. He lost in this proceeding and then sued the bank. It was held that the remedy against the attorney and the remedy against the bank were inconsistent and plaintiff was barred. We are not in accord with the decision in that case as there was clearly no inconsistency according to the principles enunciated in our court—it is squarely in conflict with Stratton v. Stratton's Adm'r, supra. It seems clear to us that the Bank's plea of election is not well taken.

It is further contended by the Bank that Banco's receiver has waived this claim by virtue of the position taken by him in his action against the directors of Banco and that no cause of action existed since it was to the best interest of Banco to carry out the transaction in the manner it was carried out. It is true that Laurent in his petition for advice as to the acceptance of a compromise offered by the Banco directors (the action was compromised by the payment of $5,000 each by a number of directors) said that he was of the opinion that the directors of Banco were not guilty of negligence or wrongdoing in purchasing the Murray Rubber Company obligation. (That allegation was made in an action to which the Bank receiver was not a party.) The evidence in this case confirms the truth of this statement because the question of making the decision was never submitted to a majority of the directors of Banco. In any event, absence of negligence on the part of the directors of Banco is not inconsistent with a charge of fraud against the officers and directors of the Bank, or with the charge that the transaction was unauthorized. Cases cited by the Bank in this connection are based upon the doctrine of election and are not in point. It seems to us there is no merit in the claim of ratification or waiver by Laurent.

Finally, in opposition to Miller's $600,000 claim, it is contended that when Laurent filed suit against the directors of Banco for mismanagement on a large number of items, including the Murray Rubber Company transaction, and accepted the compromise of $5,000 each paid by thirty-nine of the directors, such compromise must be considered payment and satisfaction of the claim here in controversy. The reasoning is that Miller's claim

against Anderson is a collateral attack on the judgment in that action, which cannot be permitted, and that therefore Miller cannot say that the aggregate loss from all transactions alleged in Laurent's petition against the directors was greater than the $195,000 recovered, the principal basis of this contention being that the compromise judgment did not allocate the recovery to any particular item.

This contention cannot be sustained for two reasons, the first being that the compromise judgment is not based upon any finding by the court that the directors were liable on account of the Murray Rubber Company transaction. The second reason is that the petition filed by Laurent, seeking the advice of court as to effecting the compromise settlement, stated that in his opinion the directors of Banco were not guilty of negligence or wrongdoing in the Murray transaction. This being a later pleading filed by him in the action, it was in practical effect an amendment to his petition abandoning his cause of action against the directors on this item, although the petition for advice was not styled as an amendment and not so offered or filed. Further, it must be assumed that the court, as it approved the compromise concerning which advice was sought in the petition, also approved and accepted the statement in the petition and permitted the consent judgment to be entered on the basis that there was no liability attaching to the directors upon this transaction. These considerations convince us that there is no merit in Anderson's plea of payment and satisfaction.

In view of the considerations stated, we are of the opinion that Miller is entitled to recover from Anderson the $600,000 claimed by him as a result of this Murray Rubber Company transaction.

The next controversy between Anderson and Miller is with reference to $131,369.19 of Banco's money which had come into Keyes' possession after the Bank failed which was retained by him. It is not a general claim against the assets of the Bank in process of liquidation but is one against the receiver as such and arises out of a transaction that took place between the time the Bank's receiver was appointed on November 17, 1930, and the time Banco's receiver was appointed on November 24th, the same year. Miller's claim is that he is entitled to

this sum with a deduction of $24,750 which will be later referred to. The trial court so found.

The facts concerning this claim are as follows: When the Bank closed it held Banco's demand note for $50,000 to which certain collateral was attached. Banco also had an overdraft of $52,637.15 with the Bank and was further indebted to it in the amount of $28,000 for several sight drafts on Banco which the Bank had accepted but had not charged to Banco's account.

When Keyes was appointed receiver of the Bank he took physical possession of everything on the premises including securities owned by Banco, which were kept in the Bank because Banco had no separate place of business.

On the closing of the Bank, Banco's board of directors determined that the situation required a sale of stocks owned by it in other banks and adopted resolutions to that effect. Among these resolutions was the following:

"Any and all cash received from the proceeds of said sale shall be, by the Committee, deposited in the Cincinnati Branch of the Federal Reserve Bank, Cleveland, Ohio, for the credit of the Louisville Branch, Federal Reserve Bank, St. Louis, Missouri, for the use of Paul C. Keyes, said Receiver of the National Bank of Kentucky."

Pursuant to these resolutions, the securities of which Keyes had taken possession were sold for $634,100, and the proceeds thereof transmitted to Keyes. Keyes surrendered to Laurent $502,730.81 of these proceeds but retained $131,369.19, the amount of the indebtedness of Banco to the Bank at the time of the closing of the Bank. The payment by Keyes to Laurent was made under a non-prejudicial agreement by the terms of which any right of claim Keyes had to the securities should attach to the proceeds turned over to Laurent and by which Keyes waived the right to interpose a plea of limitation to any proceeding by Laurent for the recovery of this sum.

It is Anderson's contention that he is entitled to have the proceeds of the securities sold applied on his claim against Banco because (a) by the terms of $50,000

collateral-form demand note of Banco's, the Bank was given a lien, not only on collateral attached thereto but on all Banco's money in Bank to secure every liability of Banco; (b) that Miller's claim is barred by limitation; and (c) the claim was not the proper subject of counter-claim.

(a) The $50,000 note of Banco held by the Bank was on the printed form customarily used by banks for collateral notes, which contains a provision to the effect that the pledge is made not only to secure the loan represented by the note but any other liability to the Bank present or future and that, in case of default, the holder might sell, not only the note pledged, but any other property of the maker in the possession or custody of the holder to the extent required for the payment of all the maker's liability to the Bank. Anderson claims that by virtue of this provision, as well as by custom and usage, Keyes had the right to apply the entire $634,100 in his custody to the payment not only of the note, the sight drafts and the overdraft, but to any other obligation of Banco's, including the Comptroller's assessment against it.

Anderson's claim in this regard would be well founded if Banco's securities had come into his custody in the regular course of business. In such circumstances he would unquestionably have had the right by contract to make application of the proceeds of the securities as contended for by him. However, these securities (excepting $24,500 to be later mentioned) did not come into his custody in the regular course of business and were merely found in the building formerly occupied by the Bank of which Keyes took possession. Keyes is not to be blamed for seizing and holding them since it was his duty not to let anything get away from him to which the Bank might have any sort of claim but it cannot be denied that his custody of the securities was by virtue of seizing them.

It appears to be too well established to admit of serious dispute that the rights given by a pledge of this character apply only to obligations incurred by the maker and to property coming into his custody of the pledgee in the regular course of business. Reynes v. Dumont, 130 U. S. 354, 9 S. Ct. 486, 32 L. Ed. 934; Hanover National Bank v. Suddath, 215 U. S. 110, 30 S. Ct.

58, 54 L. Ed. 115; 5 Zollman, Banks and Banking, Section 3051, p. 69.

In the Reynes case, the court speaking of the lien arising in favor of a bank out of contract said [130 U. S. 354, 9 S. Ct. 495, 32 L. Ed. 934]:

> "It does not arise upon securities accidentally in the possession of the bank, or not in its possession in the course of its business as such * * * "

In the Hanover Bank case the collateral security agreement between it and the Abilene Bank was of the same character as Banco's note held by the Bank. The Abilene Bank had sent certain notes to the Hanover Bank for discount and credit which the latter bank refused to discount and credit and so advised. In that situation the Abilene Bank closed and its receiver sued to recover the notes. The Hanover Bank's claim by virtue of its contract and by banking custom was denied.

The cases cited in Anderson's brief in support of his claim of a banker's lien on these securities are all cases in which the property was received in the ordinary and usual course of business and seem to have no application to the character of situation here involved.

(b) It is argued by Anderson that Miller's right of recovery of the money retained by Keyes is barred by limitation. He admits that Keyes by agreement of March 17, 1931, waived the right to plead limitation as against this claim and agreed to make restitution if so ordered by the court. It is now urged that there was no intention to make a permanent waiver of the statute of limitation and that the agreement would not be operative after the time for filing a petition in bankruptcy had expired. We find no merit in this contention because the agreement to waive limitation provided specifically that Keyes expressly waived both the limitation of four months under the bankruptcy act and the limitation of six months provided by Kentucky Statutes (Section 1911) by which preference may be avoided. But, says Anderson, the agreement to waive the statute of limitation was void and he cites in support of this contention, Moxley v. Ragan, 10 Bush 156, 19 Am. Rep. 61, and Union Central Life Insurance Company v. Spinks, 119 Ky. 261, 83 S. W. 615, 84 S. W. 1160, 27 Ky. Law Rep. 325, 69 L. R. A. 264, 7 Ann. Cas. 913. We do

not regard those cases as sustaining his position, the effect of them being merely that a waiver of limitation in advance of the accrual of a cause of action is void as being against public policy. (In this connection see Burlew v. Fidelity & Casualty Company of New York, 276 Ky. 132, 122 S. W. (2d) 990, 121 A. L. R. 751, overruling in part the Spinks case.) This rule is inapplicable in the present case because Laurent's cause of action had already accrued at the time Keyes signed the agreement waiving limitation. No case is cited sustaining the position that *after* a cause of action has accrued the parties may not, by agreement, extend the time for filing the action beyond the time in which limitation would run in absence of agreement. We have no doubt as to the validity of such agreements—no question of public policy is involved.

(c) Anderson's contention that this claim of Miller's for the $131,369.19 is not the proper subject of a counter-claim is also applicable in a lesser degree to Miller's claim of $600,000 and is here considered in its application to both claims—we say in a lesser degree because as to the $600,000 claim a set-off is sought against Anderson's claim while the $131,369.19 claim seeks affirmative relief on a claim, not against the Bank, but against the receiver himself.

It seems to us that this contention of Anderson is based upon the fictitious premise that the subject matter of the action is his claim against Miller. Of course the Civil Code of Practice, Section 96, requires that a cause of action stated in the counter-claim must arise out of the transaction stated in the petition as the foundation of the plaintiff's claim or be connected with the subject of the action and if the subject of the action were Anderson's claim against Miller for the double liability, it might with some degree of plausibility be said that Miller's claim is not connected with the subject of the action and therefore not the projer subject of counter-claim. However, the action in which the respective claims of these parties was adjudicated was the one now being considered by us, and the subject matter of this main action was the collection of Banco's assets and distribution thereof among its creditors.

A counter-claim may only be filed by a defendant against a plaintiff, or against him and another. Civil

Code of Practice, Section 96. The receiver of the Bank was not made a defendant in this action but came into it by virtue of the practice permissible in our state of filing a claim and thereby became a party to the action for all purposes involved in the settlement of Banco's affairs. Although the Bank receiver came into the action in this informal manner and became thereby, in effect, a defendant in the action, yet by the assertion of his claim against Banco's receiver he thereby, as to this claim, placed Banco's receiver in the attitude of a defendant; as such defendant the Banco receiver thereby became entitled to counter-claim as against the Bank receiver as to all matters connected with the subject of the action to which the Bank receiver had become a party and the subject of this action included Banco's receiver's right to collect assets belonging to Banco.

The Bank's receiver by presenting his claim in this informal manner became entitled to adjudication without petition or any other formal pleading, and by so doing we conclude that he submitted himself to the jurisdiction of the receivership court with full right of that court to adjust between the parties all matters connected with the collection and distribution of the insolvent's estate. Anderson's contention means, in effect, that, while invoking the jurisdiction of the receivership court to establish his right to participate in the distribution of Banco's assets, he still may deny the power of that court to require him to account for assets of Banco misappropriated by him. In these circumstances it seems clear that Banco's receiver has the right to insist that before participation in the distribution of its assets the Bank's receiver should be required to make restitution of such assets misappropriated by him. This is in harmony with the general ruling that courts of equity having jurisdiction of the parties to controversies, especially in the settlement of insolvent estates, will decide all matters in dispute and decree complete relief. Interesting cases in this connection, which lack of space forbids extended analysis of, are: Bryant Brothers et al. v. Wilson, Banking Commissioner, 253 Ky. 578, 69 S. W. (2d) 1020; Alexander v. Hillman, 296 U. S. 222, 56 S. Ct. 204, 80 L. Ed. 192.

Gamewell Fire Alarm Tel. Company v. Fire & Police Tel. Company et al., 116 Ky. 759, 76 S. W. 862, an-

other Kentucky case, while not presenting the identical situation involved in the instant case, is very much in point and against Anderson's position. It was there held that where a plaintiff sued to have the affairs of a corporation placed in the hands of a receiver, and part of the assets consisted of a claim against plaintiff for double liability, a pleading filed by the defendant corporation to enforce the double liability constituted a proper counter-claim.

Finally, regardless of the technical rules of pleading, there can be little question as to the inherent power of a court of equity in the distribution of an insolvent estate to require a claimant as a condition precedent to his being permitted to participate in the distribution to disgorge assets of the insolvent unlawfully seized and appropriated by the claimant, when the unlawful appropriation is set up in opposition to the claim within the limitation period applicable. Such opposition to Anderson's claim was interposed within five years from the unlawful seizure of the securities by the "objections and exceptions" filed to his claim by Laurent.

It is next argued for Anderson that Keyes was legally in possession of the $634,000 by reason of the action of Banco's board of directors, as evidenced by the resolution above quoted, turning over to Keyes this money without any qualifications, thereby vesting Keyes with the right to apply all of it in satisfaction of Banco's indebtedness. In answer to this, however, we may say that a number of the directors testified that the sole purpose of these resolutions was to put the money in safe hands until public excitement had subsided. These directors state that there was no purpose of vesting Keyes with any proprietary interest or preferential right to the funds, but that, on the contrary, the purpose of Banco's action was that he should have the same right in the proceeds of sale as he had in the securities themselves. But, says Anderson, the testimony of these directors is not competent to explain the purpose of the resolutions and the reasons for their action. There appears to be no merit in this position however as this is not a situation in which it is sought by parol evidence to vary or contradict the terms of a written contract between parties. This court has heretofore held that parol evidence is admissible to prove or explain the pur-

pose of corporate minutes. Bennett et al. v. Madison Sales Company et al., 264 Ky. 728, 95 S. W. (2d) 604; Kelley-Koett Manufacturing Company et al. v. Goldenberg, 207 Ky. 695, 270 S. W. 15.

In Anderson's brief, in support of his argument that he is entitled to the $502,730.81 from the proceeds of the sale of these securities turned over to Laurent, it is stated that "the situation therefore is just the same as though Mr. Keyes still had possession of this stock. If he had a right to apply the proceeds from the stock toward payment of Banco's liabilities, both existing and contingent, then he had the same right after the stock was sold and the money was transmitted through the Federal Reserve."

We agree with this statement and it seems to dispose of the contention that the action of the Banco directors in selling the securities and permitting the money to be paid to him, constituted the Bank custodian of the money in the usual and regular course of business.

Included in the securities sold for $634,000 was collateral pledged on Banco's $50,000 demand note to the Bank. The trial court deducted this ($24,500) from Miller's claim of $131,369.19 and rendered judgment in Miller's favor for the balance. This was unquestionably proper as this collateral was covered by a banker's lien. Miller does not dispute the correctness of this ruling. It is further contended by Anderson that in any event the amount of $106,619.19 for which judgment was rendered in Miller's favor on this claim must be reduced by the additional sum of $12,500. This additional reduction contended for represents the selling price of certain securities which had come to the bank attached to sight drafts drawn on Banco and which had been delivered to Banco on receipt by the Bank of Banco's check for the amount of the sight drafts, the check given by Banco therefor resulting in an overdraft of its deposit account with the Bank.

As long as these securities were in possession of the Bank, it, of course, had a banker's lien on them but by the surrender of the securities to Banco upon receipt of Banco's check the Bank thereby relinquished its lien. The Bank knew at the time it accepted Banco's check and surrendered the securities that Banco did not at

that time have sufficient funds in the Bank to meet the check and with full knowledge of this fact it chose to accept the check, creating an overdraft of Banco's account, and surrender the collateral and carry this obligation on its books as·an overdraft. The chancellor was correct in rejecting this claim.

From the considerations stated it is apparent that the chancellor was correct in rendering judgment from Miller against Anderson for the $106.619.19. This necessarily resulted in increasing the amount of the claim as filed by Anderson to the extent of this sum, since it was not included in the original claim filed by Anderson. This was done by the trial court.

The conclusions and considerations stated above are determinative of Anderson's claim against Miller for $502,730.81 representing the proceeds of the sale of Banco's securities turned over to Miller under the non-prejudicial agreement heretofore referred to. The chancellor was correct in adjudging that Anderson was not entitled to recover this sum.

The next controversy between Anderson and Miller is over the rejection of interest included in Anderson's judgment against Banco for double liability against it as stockholder in the Bank. The United States District Court entered a judgment against Banco for $4,103,-483.37, including the assessment of $3,772,162.40 and $331,320.97 as interest thereon from April 1, 1931, the date fixed by the Comptroller for payment of the assessment, to the date of the judgment. Anderson v. Akers, 7 F. Supp. 924; Id., 9 F. Supp. 151; Id., 11 F. Supp. 9. This judgment was affirmed by the United States Circuit Court of Appeals, Sixth Circuit. Atherton v. Anderson, 86 F. (2d) 518.

Prior to the filing of the action against Banco on the assessment, leave was granted to Keyes on application to the Jefferson Circuit Court to prosecute the action and the order of leave provided:

"Any final judgment recovered in such action shall be a valid and just claim against said Joseph S. Laurent as the receiver of the BancoKentucky Company herein, to be filed herein for determination as to its rights of distribution in the relation of other claims."

The judgment rendered in the District Court against Banco for this double liability recites in the concluding paragraph that:

"This judgment may be executed only by filing same in action No. 205,223, Jefferson Circuit Court, A. J. Carroll et al. v. Chemical Bank & Trust Company et al. as a just and valid claim against said Laurent, Receiver, with full right, by said court, to determine the rights of said claim to distribution in relation to other claims against said receiver."

It appears to be established beyond question that if the property of an insolvent passes into the hands of a receiver or an assignee in insolvency, interest is not allowed on the claims against free assets in the hands of the receiver or assignee, the reason behind the rule being that the delay in distribution is the act of the law and is a necessary incident to the settlement of the estate. See Thomas v. Western Car Company, 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663, also 53 C. J. 235, Section 391 and cases cited in the foot notes to that section.

While not disputing the correctness of the last mentioned principle, it is contended by Anderson that in reducing the amount of his claim, by rejecting interest, the chancellor failed to give the full faith and credit to the judgment of the United States Circuit Court of Appeals to which it was entitled.

There can be no question that the judgment in the Federal Court relied on by Anderson to sustain his claim is entitled to full faith and credit. This is disputed by no one. But it must not be overlooked that the appointment of a receiver for Banco gave the receivership court exclusive control and jurisdiction of its assets and that court alone has the right to determine the manner in which those assets shall be distributed to creditors. The judgment of the Federal Court was a judgment in personam, not in rem, and merely determined the amount to which Banco was liable on account of the assessment on bank stock held by it. The action of the trial court in rejecting interest accruing since receivership does not question the amount of Banco's indebtedness to Anderson, as established by that judgment, but merely directs the extent to which free assets in the hands of receiver may be applied to the satisfaction of the judgment.

The concluding paragraph of the judgment itself recognizes the right of Banco's receiver to determine the rights of the judgment creditor to distribution in relation to the other claims. The order of leave granted and the provision made in the judgment were, no doubt, made by both courts for the purpose of meeting the very question now presented and would seem, in themselves, to leave little room to question the trial court's right to direct distribution to Anderson upon the same equitable basis as to other creditors.

Even if the Federal Court judgment had been silent on this point, still it seems, in view of the reasons above stated, that the receivership court has power to direct the method and manner of making an equitable distribution of free assets and place judgment creditors on the footing of other creditors so long as its action does not, in effect, amount to a denial of the facts as established by the judgment.

Hatch v. Morosco Holding Company, 2 Cir., 19 F. (2d) 766, 769, the only case cited directly in point, and the only one we can find, sustains this view. In that case a claim was presented against a receiver based upon a judgment recovered by the creditor, in a state court against the insolvent debtor, the action being brought before the receivership, but not reduced to judgment until afterward. The judgment allowed interest to the date of judgment and the receivership court disallowed the claim on its entirety. On appeal it was held that the interest only should have been rejected, the court saying:

"While the judgment roll is conclusive as to the amount found owing to the appellant by the defendant corporation on June 10, 1923, the judgment allows interest from that date until the date of its entry. The date to which *interest* is to be allowed on claims of creditors sharing in the receivership assets is *a matter to be settled by the receivership court*. Thomas v. Western Car Company, 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663. The appellant should fare no better in respect to interest by reason of his judgment than he would were his claim proved by other evidence."

It seems to us, therefore, that Anderson is entitled

to share in the assets in Miller's hands only on the basis of the principal amount of the assessment included in his judgment and that the trial court properly rejected the item of interest included in the judgment.

We come now to the final question to be determined between the receivers of the Bank and Banco and that is the manner in which the claims of the respective receivers against each other shall share in dividends. As a result of our conclusions up to this point Anderson has one claim against Miller for $122,519.19 [representing indebtedness of $106,619.19 of Banco to the Bank at the time it closed plus additional undisputed claims of $15,900] and another claim of $3,772,162.40 based on the Federal Court judgment on account of Banco's liability as a stockholder in the Bank. Miller has the claim of $600,000 against Anderson. It is the contention of Miller that the liquidating dividend on Banco's claim against Anderson should be set off against the liquidating dividend to which Anderson is entitled on his claim and payment made for the balance. Anderson takes the position in his brief that this question is not presented to this court for decision at the present time; that after a decision of the case on the main points, the question now being considered must first be decided by the chancellor. In view of this position taken by Anderson, he does not brief the case on this question. Miller is very insistent that this question should be determined in order that the trial court may enter a complete and final judgment between the parties settling the entire matter, and it sems to us that this contention is sound. This being an equitable action it is the policy of this court, whenever it can reasonably be done on the record appearing before it, to direct the judgment to be entered by the trial court. It appears to us that this should be done here.

A solvent depositor or creditor of an insolvent bank may not set off a debt due him from the bank against an assessment made against him as stockholder in the bank. Hughes v. Marvin, 216 Ky. 190, 287 S. W. 561. The reason assigned for this rule is that there is a lack of mutuality between the two claims. The claim of the depositor or creditor is against the bank while the assessment for double liability is not a claim due to the bank but one that belongs to the creditors of the bank

and is recoverable by the receiver only for the purpose of distribution among the creditors. This rule is applicable here and prevents Miller from setting off against Anderson's assessment judgment the full amount of Miller's $600,000 claim.

But we are confronted with another well established rule, that a set-off is permissible as between the assessment against a creditor-stockholder and a liquidating dividend payable to him as a creditor despite the lack of mutuality between the two claims. This rule was enunciated in Farmer's Bank & Trust Company's Receiver v. Brown et al., 249 Ky. 820, 61 S. W. (2d) 628, 91 A. L. R. 323, 326. An interesting discussion of this question is found in the annotation contained in the A. L. R. citation. Under these authorities, Anderson when he comes to make a liquidating dividend in which Miller is entitled to share may withhold payment to Miller and set off the amount of that dividend against his assessment judgment.

But we have here involved a situation in which the stockholder-creditor is also insolvent and in the hands of a receiver so that Anderson may not be paid his claim in full, but is merely to receive from Miller liquidating dividends upon the basis of his assessment claim. In these circumstances it appears that the only logical method of handling the situation is that liquidating dividend should be set off against liquidating dividend. Of course, if Banco were solvent it would have to pay the assessment in full, taking credit thereon for its liquidating dividend, and by this method there would be no question of inequality in treatment of Banco's creditors. But it must be kept in mind that a stockholder's assessment creates no lien upon nor special rights to payment out of the estate of the stockholder, whether he be solvent or insolvent, nor does the assessment create any new values. As far as Banco's assets are concerned, the assessment claim is merely a general claim standing on the same footing as the claim of any other creditor and Anderson cannot expect to receive more than the other creditors receive. In the circumstances presented it appears to us that it would be illogical and inequitable to hold that Anderson may set off the dividend due Banco's receiver against the face amount of the stockholder's assessment against Banco. Were this method fol-

lowed it would result in making the assessment a pre-ferred claim against Banco's assets. In view of the considerations stated, the only equitable method is to set off liquidating dividend against liquidating dividend with payment to be made of the balance determined by this method.

The remaining questions to be considered are concerned with Chemical's claim against Miller. At the time of the respective loans by Chemical to Banco of $1,000,000 on June 17, 1930, and $600,000 on October 22, 1930, large amounts of collateral were pledged by Banco to secure the loans and on November 14, 1930, just three days before the Bank closed and ten days before the petition was filed in this action, Banco pledged additional large amounts of collateral to secure the payment of its two notes to Chemical aggregating $1,600,000. At the time Chemical's claim was filed it amounted to $1,215,323.03, having been reduced to this amount by the application of the proceeds of collateral sold. By the time of the rendition of judgment in this action all the remaining collateral had been sold, leaving a balance of $141,617.22 due Chemical.

Miller sought to avoid as a preference the transfer of additional collateral by Banco to Chemical on November 14 on the ground that the transfer operated as a preference to Chemical over the other creditors of Banco under Section 1910, Kentucky Statutes. This cause of action was first asserted by Miller more than five and one-half years after the receivership began and approximately two years after Chemical's cross petition was filed. Chemical's pleading to this cause of action asserted by Miller against it was that it was barred by limitation since it was not asserted within six months from November 14, 1930, the date of the pledge of additional collateral, as required by Section 1911, Kentucky Statutes. This plea of limitation was sustained by the trial court and the correctness of this ruling is called in question by Miller's appeal against Chemical.

Miller does not question the fact that an action to avoid an unlawful preference must, in the ordinary case, be filed within six months from the date of the transaction alleged to create the preference but he takes the position that limitation did not begin to run in favor of Chemical because it was a non-resident. He attempts

to fortify this position by arguing that if the decision of the lower court on this point be upheld a non-resident creditor who has received a preference from the Kentucky debtor cannot be made to respond to Section 1910 and disgorge the preferential assets if he chooses to keep himself beyond the jurisdiction of Kentucky courts for six months. The basis of his argument is that Section 1910 has no extra-territorial effect and is not enforcible in a foreign jurisdiction against a creditor who has secured a preference and that the New York courts would not have entertained a proceeding against Chemical under this statute. A further argument used by him in this connection is that even though a foreign jurisdiction might entertain an action of this character there is no machinery set up in the foreign jurisdiction by which the affairs of the insolvent could be wound up even though the transaction sought to be avoided might be held to be an act of insolvency within the meaning of Section 1910.

It is frankly admitted by counsel for Miller that the decision in O'Bannon's Adm'r v. O'Bannon, 13 Bush 583, is squarely against their position and would have to be overruled if their contention is to be sustained, and they are emphatic that the O'Bannon case should be overruled, in view of their arguments, the substance of which we have given above.

More consideration would be given to counsel's urgent insistence if the O'Bannon case were an isolated case, but such is not the fact. That case, decided in 1878, has been followed in other cases in this court confirming the rule therein adopted. Bybee's Ex'r, etc., v. Poynter, 117 Ky. 109, 77 S. W. 698; Aultman & Taylor Company v. Meade, etc., 121 Ky. 241, 89 S. W. 137, 123 Am. St. Rep. 193; and Daly v. Power, 248 Ky. 533, 59 S. W. (2d) 10. The Bybee case does not refer to the O'Bannon case but in the Aultman & Taylor case the court cites the O'Bannon case with approval. The Daly case does not refer to the O'Bannon case, but cites the Bybee case with approval. The O'Bannon case construing the saving clause as to limitation contained in Section 2533, Kentucky Statutes that "Limitation shall not begin to run in favor of persons coming temporarily into this state, but attaches only in favor of actual residents in good faith and after notice to the person to be affected

thereby" held that this statute applied only to persons residing in this state when the cause of action accrued and that limitation did run in favor of persons who were non-residents at the time of the accrual of the cause of action. This ruling has been consistently followed down to the present time.

It is not satisfactorily demonstrated that the New York Courts would not have entertained a proceeding under this statute against Chemical nor are we satisfied that insuperable difficulties of procedure would have been in the way in the event a preference might have been adjudged in the New York Courts. In any event, no exceptions have been set up by judicial construction or otherwise, to the rule that limitation runs in favor of a person who is a non-resident at the time of the accrual of the cause of action. We adhere to the rule established in the O'Bannon case and confirmed by the later cases referred to.

Chemical insists that in the distribution of the free assets of Banco it is entitled to share in the total assets unaffected by the fact that it held collateral security, in other words, that it is entitled to share in the free assets on the basis of its claim being $1,215,323.03, the amount due at the time of the filing of the petition, without crediting thereon collateral held by it and sold since that time which reduced its claim to $146.617.28. Miller insists that Chemical may only prove its claim for the balance of $146,617.28 remaining after deducting the proceeds of collateral held by it. The basis on which Chemical insists it is entitled to participation is commonly known and referred to as the "equity rule," while the basis on which Miller insists Chemical must participate is usually referred to as the "bankruptcy rule." The trial court upheld Miller's contention, and Chemical's appeal against Miller brings into question the correctness of that ruling.

There is little doubt that the "equity rule" was in force in Kentucky in all cases of the distribution of the estate of an insolvent prior to 1856. The special master in his report filed in the lower court entered into a most learned discussion of this question and traced the development of the law from 1856 to the present time. Were it not that lack of space forbids we would be glad to

incorporate in this opinion his analysis of the development of the law on this subject, but as the opinion is necessarily developing into one of extreme length, we will content ourselves with citing the acts of the legislature and court decisions discussed by him and then summarize with the conclusions enunciated in his report.

The development of the law in Kentucky on this subject may be seen by an examination of the following acts:

Act of 1839 (Gen. Stats. Ch. 39, Art. II, Section 34) as amended by the Act of 1893, now Section 3869, Kentucky Statutes. Act of 1856, (Gen. Stats. Ch. 44, Art. II, Sec. 7) as amended by Ch. 119, Section 11, of the Act of 1892 (Kentucky Statutes, Section 1916). Act of 1894, now Kentucky Statutes Section 74. Act of 1912, Ch. 4, Section 17, now Kentucky Statutes, Section 165a-17, Act of 1934, Ch. 10, Section 2, now Kentucky Statutes, Section 165a-17, and by a consideration of the following decisions of our court: Logan v. Anderson, 18 B. Mon. 114; Hibler, etc., v. Davis' Adm'r, 13 Bush 20; Citizens' Bank of Paris v. Patterson, etc., 78 Ky. 291; German Security Bank v. Jefferson, 10 Bush 326; Northern Bank of Kentucky v. Keizer, 2 Duv. 169; Fayette National Bank of Lexington, etc., v. Kenney's Assignee, 79 Ky. 133; Hill et al. v. Cornwall & Brother's Assignee, 95 Ky. 512, 26 S. W. 540, 16 Ky. Law Rep. 97; Bank of Louisville v. Lockridge, 92 Ky. 472, 18 S. W. 1, 13 Ky. Law Rep. 673.

The present state law of Kentucky, as traced through the foregoing acts of the Legislature and court decisions, is that a secured creditor can prove against free assets only the balance of his claim, after deducting therefrom the amount of his security, in the following instances: (1) where there has been either a voluntary assignment for the benefit of creditors or a preferential conveyance resulting in an involuntary assignment; (2) where the insolvent is dead; and (3) where the security was not obtained by contract with the insolvent.

As the so-called "equity rule" applied in all cases of distribution of insolvent estates prior to 1856, and as the statutes and decisions mentioned merely narrowed the application of the "equity rule," it appears that in all other cases the "equity rule," first announced

in Logan v. Anderson, supra, under which the secured creditor may make double proof, still obtains.

We may point out that, beginning with the first inroad made on the application of the "equity rule," there seems to have developed on the part of the legislature and our court such a tendency to restrict or narrow the application of the rule in any situation in which it was presented as to illustrate almost the development of a public policy against it. As late as 1912, by the act previously mentioned, it was provided that the distribution of the assets of an insolvent bank should be according to the "bankruptcy rule" so that, were it not for the Act of 1934 which amended this Act of 1912 and provided that thereafter the assets of insolvent banks should be distributed according to the "equity rule," there would be a sound basis for saying that it was the settled policy of the legislature and court that assets of all insolvents should be distributed according to the "bankruptcy rule." The Act of 1934, revitalizing the "equity rule," necessarily destroys the foundation for any such assumption, and we may not inquire into the considerations or motives entering into its passage.

Counsel for Miller, to avoid the application of the "equity rule" as to Chemical's claim, insist that the proceedings for the appointment of a receiver for Banco, to which Banco consented, were equivalent to a voluntary assignment by Banco for the benefit of its creditors. This is the question we are now called on to determine.

It is argued with great earnestness in behalf of Chemical that Banco was not insolvent at the time of the filing of the petition in this case and that therefore this proceeding could in no sense be said to be, or equivalent to, a voluntary assignment for the benefit of creditors. To sustain its contention that Banco was not insolvent, reliance is placed by Chemical on the fact that in receivership proceedings against Banco in Delaware receivership was denied because Banco was not shown to have been insolvent at the time the proceedings were instituted there. (See Rogers et al. v. Banco Kentucky Company, 18 Del. Ch. 23, 156 A. 217.) In that case, however, the basis of the decision seems to have been that the contingent liability of Banco as a stockholder in a national bank and in a trust company could not be con-

sidered as an existing obligation or liability and that impending or subsequently matured insolvency could not be related back to the beginning of a receivership proceeding for the purpose of giving its courts jurisdiction to appoint a receiver.

In the technical sense that the amount of Banco's debts, then subject to immediate enforcement, exceeded the value of its assets, it must be admitted that Banco was not insolvent. This is the character of insolvency which would have been necessary to give the Delaware court jurisdiction to appoint a receiver at the instance of stockholders. But in the practical sense of the term, as apparently interpreted by our court, the unmatured, but potential, assessment of the stockholders' liability, which was fixed in character but not in amount when the Bank closed, rendered Banco insolvent in fact. As said by this court in Oscar C. Wright Company et al. v. Steenman, 254 Ky. 381, 71 S. W. (2d) 991, 995:

> " 'A corporation whose assets are insufficient to pay its debts, and which has ceased to do business, or has taken, or is about to take, a step which will incapacitate it from conducting the corporate enterprise with reasonable prospect of success, or its financial embarrassment is such that early suspension and failure must ensue,' is as a matter of law insolvent."

Again, in Thompson v. Heffner's Ex'rs, 11 Bush 353, it was held that contingent liabilities may be taken into consideration in determining solvency or insolvency and the true rule was said to be that it must be shown that the debtor knew with reasonable certainty that he would be called on to pay enough of his liabilities for others, when added to his own indebtedness, to render him unable to pay all.

There is little, if any, doubt that when the contingent liability of Banco for its assessment as owner of bank stock was taken into consideration Banco was insolvent and that this fact was known to its officers and directors. As a matter of fact, this definitely appears in the record in the appeal of Miller against Anderson in the form of a stipulation between Miller and Anderson, paragraph 12 of the stipulation reciting that:

"No assessment was levied on the National

Bank of Kentucky stock until February 1931, but on said November 17, 1930, and continuously thereafter, Banco's contingent liability for this statutory assessment and for payment thereof in the amounts mentioned above, was well known to Keyes, Receiver, and the officers and directors of Banco, as well as was the fact that Banco's holdings of stock and other banks were greatly depreciated in the market value so that, in any event, Banco was and would be insolvent when the statutory assessment was imposed upon its stockholdings in the National Bank of Kentucky and the Louisville Trust Company."

As Banco's eventual insolvency was known to the officers and directors before filing the petition, it seems to us there can be no doubt that the filing of the receivership proceedings by the executive committee of the board of directors, consented to by Banco, was equivalent, in effect, to a voluntary assignment for the benefit of creditors. To hold otherwise would be to ignore all the realities of the situation and trade substance for shadow. The mere fact that the court was to select the person by whom the trust was to be executed and that this person would be denominated "receiver" instead of "assignee" did not change the character of the liquidation or affect the substance of the transaction. As said in 2 R. C. L. 661, Section 18:

"In order to constitute an *assignment for the benefit of creditors* in the eyes of the law it is not necessary that the transaction should be so called by the parties, or even, in some cases, that such should have been the intent. If the essentials of an assignment, as prescribed by the law of the particular jurisdiction, are present, it will be construed as such regardless of its form of phraseology. In general to constitute an assignment for the benefit of creditors, there must be a trustee, creditors, and a *cestui que trust,* who can compel an enforcement of the trust; but it is not necessary that a trustee should be named as such or be specifically named at all, if it is definitely agreed that there shall be a trustee in fact, to hold property and administer it as such."

By the filing of the petition Banco placed upon the court the responsibility of selecting the trustee, which

was a natural action in view of the turmoil and confusion existing in banking circles. There is slight, if any, difference in the powers of the receiver, the rights of the creditors, the intent of the parties and the ultimate results to be obtained from those which would have been secured by a general assignment for the benefit of creditors. It is true that certain statutory procedure is applicable to assignments and not necessarily so to receivership proceedings, but such procedure is not essential to substantive rights.

It appears that our court in at least two instances has peered through the shadow of a transaction of this character to ascertain the substance behind it. In Muir v. Samuels & others, 110 Ky. 605, 62 S. W. 481, 23 Ky. Law Rep. 14, by parol agreement among the partners, all assets of the firm were turned over to a partner to distribute to partnership creditors. It was held that this was an assignment for the benefit of creditors which precluded one creditor from getting advantage of another by attachment, although there was no pretense of following the statutory procedure prescribed in the case of assignments. In Butler v. Dillehay Brick Company's Trustee, 187 Ky. 224, 219 S. W. 154, is illustrated the disposition of our court to regard the substance rather than the form of the transaction pertaining to assignments for the benefit of creditors and to disregard the manner in which the debtor caused the trust to be created.

The Federal Courts have taken the position that the similarity between the consequences of consent receivership and the consequences of an assignment, under a liberal construction of the priority act (U. S. C. A. 31, Section 191; R. S., Section 3466), gives priority to claims of the United States. Price, Receiver, v. United States, 269 U. S. 492, 46 S. Ct. 180, 70 L. Ed. 373; United States v. Butterworth-Judson Corporation, 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 380; New York v. Maclay et al., 288 U. S. 290, 53 S. Ct. 323, 77 L. Ed. 754; Davis v. Miller-Link Lumber Company, 5 Cir., 296 F. 649. While the ultimate question in those cases was not whether a consent receivership was in fact a voluntary assignment, nevertheless they are authority for the position that the substance rather than the form of proceedings may be looked to. In the Butterworth-Judson Cor-

poration case, the court said [269 U. S. 504, 46 S. Ct. 180, 70 L. Ed. 380]:

> "Taken in connection with its insolvency, now conceded, respondent's answer admitting the allegations of the complaint and its consent to the decree appointing receivers amounted to the handing over of all its property and business to the receivers to be administered, under the direction of the court, as a trust fund to pay respondent's debts. In substance, the things done by respondent amounted to a voluntary assignment of all its property within the meaning of Section 3466. * * *"

Much stress is laid by Chemical on Vaccaro v. Security Bank, 6 Cir., 103 F. 436. It is urged that this is in opposition to the last mentioned Federal cases holding that a consent receivership is equivalent to a voluntary assignment for the benefit of creditors. We do not regard it as being in direct conflict with the rule enunciated in those cases. It was merely held that where a *solvent* member of a partnership died and his administrator secured the appointment of a receiver to settle the firm's affairs, the firm being heavily indebted to the deceased partner, and no opposition being made to the appointment of a receiver, the receivership was not equivalent to a voluntary assignment. In that case the court questioned the consent character of the receivership and held that even if it be regarded as such, the appointment of a receiver in such a suit for the purpose of liquidating the affairs of a solvent partnership was not the making of a general assignment. It must be considered also that the court had in mind the harsh consequences, namely, bankruptcy, which would have followed a holding to the contrary.

Unquestionably the receivership proceedings in the instant case eventually developed into the equivalent of a voluntary assignment for the benefit of creditors. At the time Chemical filed its claim the proceedings occupied the status of an assignment and it was alleged in Chemical's cross petition that the receiver at that time had custody and control of all of Banco's assets for the purpose of making distribution unto its creditors.

Without deciding that in every instance a consent receivership is the quivalent of a voluntary assignment

for the benefit of creditors, we are of the opinion that, for the purpose of determining whether the ''equity rule'' or ''bankruptcy rule'' should be applied in determining the method of distribution of assets, the receivership proceeding here in question was in substance and effect a voluntary assignment for the benefit of creditors. This being true, it follows that Chemical may prove its claim only for the balance due after deducting collateral held by it, this balance being $146,617.28.

This brings us to the final question involved in Chemical's appeal against Miller. Chemical contends that if the ''bankruptcy rule'' is the proper one applicable in determining the amount for which its claim is probable, then it has the right to apply the proceeds of collateral held by it first to the satisfaction of interest accruing since the filing of the petition, then to principal, and to prove for the balance.

Many authorities are cited by Chemical to sustain its contention but in none of them do we find such a rule announced. Chief reliance is placed on Richmond & I. Construction Company v. Richmond N. I. & B. R. Company, 6 Cir., 68 F. 105, 34 L. R. A. 625, a case decided according to Kentucky law; but in that case the contest was not between creditors with equal rights to participate pro rata in free assets. The claims on which interest was allowed were secured by statutory liens against all the property of the railroad and were payable in full, including interest, before any proceeds of the property could become available for payment of bonds claiming under a junior mortgage lien. The effect of the decision was that the statutory lien holders could devote all of the property to full satisfaction of their principal and interest, without infringing the rights of creditors of a lower rank.

Chemical relies strongly also on Board of Commissioners of Sweetwater County v. Bernardin, 10 Cir., 74 F. (2d) 809, 815, and particularly on the following language in the opinion, which is in substance the language appearing in Fletcher Cyclopedia Corporations, Ch. 64, Section 7939:

"Where there are claims of different rank or dignity and there are sufficient assets of the estate

available to pay claims of a higher rank in full with interest accruing during receivership, interest will be paid on such claims to the date of payment, even though what remains is insufficient to pay claims of a lower rank.''

The rule enunciated here is merely a confirmation of the decision in the Richmond & I. Construction Company case, and it was not held that a secured creditor could apply proceeds of his security first to interest, then to principal, and prove for the balance.

We find in Sexton v. Dreyfuss, 219 U. S. 339, 31 S. Ct. 256, 55 L. Ed. 244, definite authority squarely opposed to Chemical's contention. There the ''bankruptcy rule'' was being followed and the identical claim that Chemical makes here was made by a creditor. This claim was denied in a well reasoned opinion by Mr. Justice Holmes. Lack of space forbids our inserting excerpts from the opinion and the reader is referred to it. Its reasoning and logic appear to us as conclusive.

Gamble v. Wimberly, 4 Cir., 44 F. (2d) 329, was a case settling the affairs of a national bank and followed the ruling in Sexton v. Dreyfuss. Counsel for Chemical say that in relying on this authority Miller's counsel seek to blow both hot and cold in that the ''equity rule'' was being followed (this rule is applicable to distribution of insolvent national bank assets) and that after discarding it Miller's counsel seek to go back to it to prevent the pledgee from applying collateral to interest. However, in Sexton v. Dreyfuss the ''bankruptcy rule'' was being followed, so that we have authority that whether the ''bankruptcy rule'' or the ''equity rule'' be followed the contention made by Chemical cannot be sustained.

While a secured creditor may collect all of his principal and interest *as far as his security suffices,* and while he may apply dividends on the collateral accruing after the date of the petition to after-accruing interest (this was permitted by the trial court), we are of the opinion that when he seeks to participate in free assets with unsecured creditors all proceeds of his security must be applied on the principal of his debt and that his interest must be ignored just as is the case of the other

creditors. It follows that the trial court was correct in rejecting this contention on the part of Chemical.

We have neglected up to this point to mention the appeal of Chemical against Anderson, but that appeal raises the identical question raised on the appeal of Miller against Anderson and requires no separate discussion—the same conclusions are applicable.

The judgments are reversed on the appeals of BancoKentucky Company's Receiver v. National Bank of Kentucky's Receiver and Chemical Bank & Trust Company v. National Bank of Kentucky's Receiver.

The judgments are affirmed on the appeals of National Bank of Kentucky's Receiver v. BancoKentucky Company's Receiver, Chemical Bank & Trust Company v. BancoKentucky Company's Receiver, and BancoKentucky Company's Receiver v. Chemical Bank & Trust Company.

The lower court will enter judgments in conformity with this opinion.

Whole Court sitting.